**U.S. Bank N.A. v DLJ Mtge. Capital, Inc.**

2024 NY Slip Op 34538(U)

December 31, 2024

Supreme Court, New York County

Docket Number: Index No. 650369/2013

Judge: Joel M. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  **HON. JOEL M. COHEN**  PART _____03M_____

*Justice*

--------------------------------------------------------------------------X

U.S. BANK NATIONAL ASSOCIATION, solely in its capacity
as Trustee of the
HOME EQUITY ASSET TRUST 2007-1
(HEAT 2007-1)

INDEX NO.  _____650369/2013_____

Plaintiff,

- v -

DLJ MORTGAGE CAPITAL, INC.,

Defendant.

--------------------------------------------------------------------------X

## DECISION AFTER NON-JURY TRIAL

Following a two-week non-jury trial, and voluminous post-trial submissions, the Court

concludes that Defendant DLJ Mortgage Capital, Inc. ("Defendant" or "DLJ") is liable to

Plaintiff U.S. Bank National Association ("Plaintiff" or "U.S. Bank" or the "Trustee"), solely in

its capacity as Trustee of the Home Equity Asset Trust 2007-1 (the "Trust" or "HEAT 2007-1"),

for breaches of Representations and Warranties made in connection with 210 of the 783

challenged mortgage loans in the Trust.  Damages will be determined in a separate hearing,

unless otherwise stipulated by the parties.

## INTRODUCTION AND SUMMARY OF FINDINGS

This is a residential mortgage-backed securities ("RMBS") case.[1]  At trial, Plaintiff

claimed that DLJ breached certain Representations and Warranties ("R&W" or "Reps") in a

---

[1] "RMBS are financial instruments, popular in the mid–2000s, backed by individual mortgage
loans.  The securitization process involves a 'sponsor' who acquires a bundle of loans from
banking institutions ('originators') and sells the pooled loans to a 'depositor,' who places the

## DECISION AFTER NON-JURY TRIAL

Pooling and Servicing Agreement ("PSA" [JX-332]) concerning 783 of 5,149 securitized loans (each a "Loan" and collectively the "Loans") comprising the Trust. After trial, Plaintiff withdrew its claims as to 8 of the 783 challenged Loans (NYSCEF 1142 ¶2).

As the Court of Appeals observed, "the PSA contains a 'sole remedy' provision granting U.S. Bank, as trustee, the limited authority to seek a remedy for any breach by DLJ of these representations and warranties through a contractually established 'repurchase protocol' requiring DLJ to cure, repurchase, or substitute a nonconforming mortgage loan within 90 days of notice or independent discovery of such breaching loan" (*U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 38 NY3d 169, 174 [2022]).

In order to establish DLJ's liability under the Repurchase Protocol, Plaintiff must establish on a Loan-by-Loan basis that it (1) provided pre-suit notice of, or that DLJ independently discovered, the alleged R&W breach; (2) that a breach occurred; and (3) that the breach had a material and adverse effect ("MAE") on the Loan.[2] If Plaintiff complies with the Repurchase Protocol and establishes a breach and MAE, it is entitled to recover the "Repurchase Price" as defined in Section 2.03(d) of the PSA.

---

loans into a trust. The trust issues certificates purchased by investors, who are entitled to a portion of the revenue stream from the borrowers' payments. The mortgage loans in the trust are serviced by a 'servicer,' a party typically affiliated with the sponsor or originator. Each trust has a Trustee which acts on behalf of the Trust and whose responsibilities are prescribed by the securitization trusts' governing agreements" (*IKB Intl., S.A. v Wells Fargo Bank, N.A.*, 40 NY3d 277, 282 [2023]).

[2] A material and adverse effect occurs where the breach "materially increased a loan's risk of loss" (*Home Equity Mtge. Tr. Series 2006-1 v DLJ Mtge. Capital, Inc.*, 175 AD3d 1175, 1177 [1st Dept 2019]).

[* 2]

A. **Notice/Discovery**

The 783 Loans in dispute include 303 loans for which Plaintiff provided pre-suit notice to DLJ ("Noticed Loans"), and 480 loans as to which Plaintiff did not provide pre-suit notice but claims DLJ independently discovered breaches ("Non-Noticed Loans"). As to the latter category, the Court determined prior to trial that Plaintiff may prove DLJ's independent discovery of breaches "by showing that [DLJ] knew or should have known about breaches of representations and warranties" as to "individual loans or identifiable groups of loans. . ." (NYSCEF 1028 (September 22, 2022, Transcript at 34-37) [citing *U.S. Bank Nat. Ass'n v GreenPoint Mortg. Funding, Inc.*, 147 AD3d 79, 86 [1st Dept 2016] and *Fixed Income Shares: Series M v Citibank, N.A.*, 157 AD3d 541, 542 [1st Dept 2018]). The Court explained that, given recent Court of Appeals guidance (*U.S. Bank N.A.*, 38 NY3d 169), "there must be some granularity in the proof [as to DLJ's independent discovery of breaches] whether it's referring to individual loans or identifiable groups of loans . . . I'm going to need to find that the requisite discovery applies to the individual loans. . ." (NYSCEF 1028 at 36–37).

As explained in greater detail below, Plaintiff's attempted proof of DLJ's "independent discovery" of breaches as to the Non-Noticed Loans largely fell short of the mark. Plaintiff did establish that DLJ independently discovered breaches in 34 of the 480 Non-Noticed Loans based largely on documents obtained through discovery (NYSCEF 1143 at Appendix E [listing 36 Loans for which Plaintiff claims DLJ actually discovered breaches]). As to the remainder, however, Plaintiff's proof consisted largely of generalized evidence regarding DLJ's (i) loan review process; (ii) stated concerns about the overall poor quality of the Loans and their originators; (iii) repurchase demands to originators, and (iv) flaws in its due diligence and quality control practices. As described below, the Court found those arguments to be unpersuasive and

not supported by a preponderance of the evidence (*see U.S. Bank N.A.*, 38 NY3d at 181 ["the trustee's assertion that the repurchase protocol can be invoked for certain breaching loans through an allegation that *other* loans are nonconforming is nothing more than an attempt to avoid the consequences of the sole remedy provision and pursue claims of 'pervasive' breach without having adequately complied with the notice requirements of the repurchase protocol"] [emphasis in original]). Plaintiff also argues in post-trial briefing that DLJ should be deemed to have discovered breaches because the knowledge of certain Loan servicers, including DLJ related entity Select Portfolio Servicing ("SPS"), should be imputed to DLJ by way of an (unpled) agency theory. The Court similarly found those arguments to be unpersuasive and not supported by the evidence.

As to the 446 Non-Noticed Loans as to which Plaintiff did not establish DLJ's independent discovery, judgment will be entered in DLJ's favor. As to the remaining 34 Non-Noticed Loans (as to which DLJ independently discovered breaches), together with the 303 Noticed Loans, the Court will consider whether Plaintiff has established the remaining elements of its claim for breach of contract.

### B. <u>Breach and Material Adverse Effect</u>

Plaintiff's claims of material adverse breach are primarily based on three Representations & Warranties contained in the PSA: (i) the Underwriting Guidelines Rep; (ii) the Mortgage Loan Schedule ("MLS") Rep; and (iii) the Prudent Underwriting (or Group 1) Rep.

Plaintiff alleges four main categories of breach: (i) false or inaccurate information on the MLS (e.g., debt-to-income ratio ["DTI"]; loan-to-value ratio ["LTV"]; combine loan-to-value ratio ["CLTV"]; and loan type); (ii) false statements by borrowers on Loan applications (e.g., income, debt, employment, and occupancy status); (iii) unreasonable stated income; and (iv)

[* 4]

missing documents in Loan files. Plaintiff's claims are supported principally by their expert, Robert Hunter, who "re-underwrote" each of the Loans. In addition to the information contained in the Loan files, Mr. Hunter relied on certain post-origination sources, including Bureau of Labor Statistics ("BLS") data regarding salary ranges for various occupations, bankruptcy records, tax filings and third-party research platforms (e.g., Lexis, Data Tree and Data Verify). Some of the post-origination documents considered were found in the loan files (e.g., tax returns submitted to loss mitigation), while others were obtained by Mr. Hunter's team from public (e.g., PACER) and private sources (e.g., Data Tree, LEXIS).

DLJ contends that Plaintiff's interpretations of the Reps are incorrect. Specifically, DLJ argues that the Underwriting Guidelines Rep does not warrant against borrower fraud or misrepresentation; that the Group 1 Rep is limited to breaches that concern DLJ's actual knowledge and also does not protect against fraud and misrepresentation; and that the MLS Rep only guarantees that information on the Schedule was properly transcribed from the loan files, not that it was objectively accurate. DLJ also argues that the post-origination sources relied on by Mr. Hunter constitute hearsay and, in any event, do not prove breaches. DLJ's expert, Peter Kempf, argues that Mr. Hunter's findings are incorrect and that many of the Loans comply with the Guidelines. Among other things, Mr. Kempf submits that certain Guidelines do not require underwrites to conduct independent research; that underwriters may issue exceptions to the Guidelines; and that documents may be missing from loan files for a host of valid reasons. Finally, DLJ argues that Plaintiff's MAE analysis is improper, and that Plaintiff has not proven an MAE with respect to any Loan.

The Court has considered the evidence, including the Loan files and applicable Guidelines, as well as the experts' findings with respect to each of the Loans, in determining

whether a breach and resulting MAE occurred. Ultimately, of the 347 Noticed and Non-Noticed Loans as to which Plaintiff has a potentially viable claim, the Court finds that Plaintiff has established by a preponderance of the evidence a breach (or breaches) and an MAE as to 210 Loans.

**THE REPRESENTATIONS & WARANTIES AND THE REPURCHASE PROTOCOL**

## A. The Representations & Warranties

Plaintiff's claims are focused on the following three Reps contained in the PSA (NYSCEF 1063 [Stipulation of Facts and Procedural History ¶¶16–19] [the "Stip"]).

### 1. The Underwriting Guidelines Rep

The Mortgage Loan complies with all the terms, conditions and requirements of the originator's underwriting standards in effect at the time of origination of such Mortgage Loan.

### 2. The MLS Rep

The information set forth in the Mortgage Loan Schedule, attached to the Agreement as Schedule I, is complete, true and correct in all material respects as of the Cut-off Date.[3]

---

[3] The "Mortgage Loan Schedule" is a defined term in the PSA, referencing a list of 27 specifically enumerated fields of information pertaining to each of the Loans as follows:

Mortgage Loan Schedule: The list of Mortgage Loans . . . transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, attached hereto as Schedule I, setting forth the following information with respect to each Mortgage Loan by Loan Group:

(i)      the Mortgage Loan identifying number;
(ii)     a code indicating the type of Mortgaged Property and the occupancy status;
(iii)    a code indicating the Servicer of the Mortgage Loan;
(iv)     the original months to maturity;
(v)      the Loan-to-Value Ratio at origination;
(vi)     the combined Loan-to-Value Ratio at origination;
(vii)     a code indicating the existence of a subordinate lien for the related Mortgaged Property;
(viii)   the related borrower's debt-to-income ratio at origination;
(ix)     the related borrower's credit score at origination;
(x)      the Mortgage Rate as of the Cut-off Date;
(xi)     the stated maturity date;

[* 6]

### 3. The Group 1 Rep

To the knowledge of the Seller . . . with respect to any Group 1 Mortgage Loan, the methodology used in underwriting the extension of credit for each such Mortgage Loan did not rely solely on the extent of the Borrower's equity in the collateral as the principal determining factor in approving such extension of credit but instead employed objective criteria such as the Borrower's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's Originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Mortgage Loan

---

(xii) the amount of the Scheduled Payment as of the Cut-off Date;

(xiii) the original principal amount of the Mortgage Loan;

(xiv) the principal balance of the Mortgage Loan as of the close of business on the Cut-off Date, after deduction of payments of principal due on or before the Cut-off Date whether or not collected;

(xv) the purpose of the Mortgage Loan (i.e., purchase, rate and term refinance, equity take-out refinance);

(xvi) a code indicating whether a Prepayment Premium is required to be paid in connection with a prepayment of the Mortgage Loan and the term and the amount of the Prepayment Premium;

(xvii) an indication whether the Mortgage Loan accrues interest at an adjustable Mortgage Rate or a fixed Mortgage Rate;

(xviii) the Index that is associated with such Mortgage Loan, if applicable;

(xix) the Gross Margin, if applicable;

(xx) the Periodic Rate Cap, if applicable;

(xxi) the Minimum Mortgage Rate, if applicable;

(xxii) the Maximum Mortgage Rate, if applicable;

(xxiii) the first Adjustment Date after the Cut-off Date, if applicable;

(xxiv) the Servicing Fee Rate;

(xxv) the Expense Fee Rate;

(xxvi) a code indicating whether the Mortgage Loan is covered under a borrower paid or lender paid Primary Insurance Policy (and, if so, the name of the insurance carrier) and the rate at which any lender paid Primary Insurance Policy premium is calculated, if applicable; and

(xxvii) a code indicating whether the Mortgage Loan is a MERS Mortgage Loan and, if so, its corresponding MIN.

[* 7]

B. **The Repurchase Protocol**

Plaintiff's claims are governed by the following Repurchase Protocol (PSA §2.03[d]; Stip ¶21).

> Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. The Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made by it pursuant to Section 2.03(b) which materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Qualified Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Repurchase Price in the manner set forth below…

### TRIAL

A bench trial was held between January 23, 2023, and February 3, 2023.  In addition to the 1,902 Joint Exhibits, Plaintiff and Defendant introduced another 43 exhibits that were assigned "PX" and "DX" prefixes.  Another 261 exhibits identified by Plaintiff were provisionally admitted pending post-trial briefing (NYSCEF 1135 [Tr. 544, 621, 902, 1036]). Based on the post-trial briefing, those exhibits (NYSCEF 1143 at Appendix L) are admitted and have been considered by the Court.

Plaintiff did not call any fact witnesses to provide live testimony.  Bruce Kaiserman, a defense witness and former DLJ employee, was the only fact witness to testify live (Tr. 697-829).  Mr. Kaiserman was not personally involved in drafting the PSA but was familiar with DLJ's RMBS business (Tr. 711-712).  Mr. Kaiserman testified as to his understanding of the Reps, the underlying negotiation process, risk factors affecting Loans including DTI and LTV,

[* 8]

and DLJ's diligence practices. However, Mr. Kaiserman did not address the specific Loans at issue in this case, or the negotiation of the PSA involved in this case.

The parties also designated video deposition testimony of other fact witnesses including Cynthia Baird (Tr. 885-902), Bertram Hill (Tr. 904-912); Joseph Quarto (Tr. 914-935); Jason Nordyk (Tr. 936-941); Henry Salomon (Tr. 942-943); Robert Sacco (Tr. 955-975); Peter Sack (Tr. 976) and Jim Byrnes (Tr. 1321-1323). Additionally, the parties submitted written deposition transcript designations of other witnesses.

## A. **Plaintiff's Efforts at Trial to Prove DLJ's Independent Discovery of Breaches**

In an attempt to establish that DLJ independently discovered breaches in the Non-Noticed Loans at issue, Plaintiff presented the video deposition testimony of former DLJ employees Bertram Hill (quality control), Jason Nordyk (former head of Bulk Channel's due diligence group at DLJ) and Robert Sacco (former head of DLJ's Credit Group). Prior to presenting the depositions, Plaintiff's counsel asserted:

> We believe these depositions will give your Honor context about the policies and practices that were in place at DLJ and Credit Suisse in this relevant period. They're going to be focused on primarily relating to those practices, DLJ's internal procedures for approving loans, for reviewing loans, it's due diligence practices, its quality control practices, and related issues that we will then be able to tie in to the 480 loans that are at issue in this case with respect to discovery.

(Tr. 684).

Mr. Hill's testimony concerned, among other things, "Seller Scorecards" generated by DLJ to track "critical" issues in loans sold do DLJ on an originator-by-originator basis. Mr. Nordyk's testimony concerned, among other things, DLJ's quality control practices as well as repurchase requests made by DLJ to originators. Mr. Sacco's testimony concerned, among other things, DLJ's concerns with the underwriting practices of certain loan originators. The deposition testimony did not relate specifically to the 480 Non-Noticed Loans.

[* 9]

Defendant objected to the designations on, among other grounds, relevance because the testimony related to loans that were not securitized in the HEAT 2007-1 Trust (Tr. 958-959). Plaintiff's counsel responded:

> Even though it is not one of the 783 loans, it discusses and describes DLJ's practices and procedures and goes again to the broader question of discovery and what DLJ knew about practices and concerns with its own underwriting of loans.

(Tr. 959). Plaintiff's counsel argued that the testimony "goes to DLJ's knowledge of problems with originators and willingness to cut corners in approving loans" to which the Court responded that Plaintiff appeared to be pursuing a "negligence" theory (Tr. 964).

Plaintiff's counsel countered by arguing that the testimony "shows a general practice that DLJ had of approving sellers or bending it's rules to bring more seller loans into the pipeline here" (Tr. 964). The Court responded, "it sounds a little bit like you're saying because they were lax generally; therefore, that means they discovered breaches with respect to all loans from all originators" (Tr. 965). Counsel for Plaintiff's represented that, with respect to the Non-Noticed Loans, "we will be able to show the link between. . .the specific originators. . .and the origination of those loans" (Tr. 965). While the Court permitted introduction of the deposition testimony, it stated, "I think general knowledge is fairly far away from discovery of breaches in the 480 loans" (Tr. 965).

Plaintiff made no further efforts to prove independent discovery by DLJ of breaches in any of the Non-Noticed Loans at trial. Notably, Trustee did not plead or otherwise indicate at trial that it intended to rely on an agency theory to establish DLJ's actual or constructive knowledge of R&W breaches through SPS and loan originators.

At the close of Plaintiff's case, DLJ moved for judgment as a matter of law "limited to the discovery theory and the 480" Non-Noticed Loans pursuant to CPLR 4401 (Tr. 1039-1049).

[* 10]

In opposition, Counsel for Plaintiff stated that "[w]e've given [the Court] highlights some of the best hits in terms of the evidence that is there. It is a lot. There's really a ton of additional evidence that will be presented that we plan to present and highlight for you in the papers based on the submission of all this additional evidence that your Honor just ruled upon" (Tr. 1048). The Court deferred ruling on the motion (Tr. 1049).

DLJ renewed its motion for judgment as a matter of law at the conclusion of its case (Tr. 1404). Specifically, DLJ argued that Plaintiff's proof of discovery, including Seller Scorecards and early payment defaults ("EPD"), was insufficient to demonstrate independent discovery of breaches in the Non-Noticed Loans at issue in this case (Tr. 1404-1417). Plaintiff responded that the evidence showed that certain originators, in particular Lime, EquiFirst and Aegis, were known by DLJ to have originated some loans that did not comply with the Guidelines (Tr. 1417-1421). The Court inquired of Plaintiff's counsel whether the evidence discussed at trial (e.g., the Seller Scorecards) showing "critical" issues in approximately twenty percent (20%) of sampled loans was sufficient to establish DLJ's discovery of breaches in the 480 Non-Notice Loans (Tr. 1420-1422). Counsel responded that the evidence was sufficient when viewed "holistically" to establish the requisite link (Tr. 1421-1422). The Court again deferred a ruling (Tr. 1422-1423).

### B. The Parties' Re-Underwriting Experts Disagree on Whether Breaches Occurred

The primary trial witnesses were Plaintiff's re-underwriting expert, Robert Hunter and Defendant's re-underwriting expert, Peter Kempf. Messrs. Hunter and Kempf submitted direct testimony by affidavit (NYSCEF 1066 ["Hunter Aff."] and NYSCEF 1106 ["Kemp Aff."]). They each provided detailed, Loan-level opinions and replies to their counterpart's opinions, which are incorporated into the parties' voluminous joint exhibits. However, only a few of the 783 Loans at issue in this case were mentioned at trial, and some of those later were withdrawn

[* 11]

by Plaintiff (e.g., JX-2486, JX-2465, JX-2385 [withdrawn after trial]), JX-2538, JX-2561, JX-2476, JX-2617, JX-2530 [withdrawn after trial]).

Mr. Hunter and his team re-underwrote each of the 783 Loans at issue. As part of the re-underwriting process, Mr. Hunter relied in part on post-origination data including BLS data, Lexis-Nexis, Accurint, MERS, Data Verify, Data Tree, The Work Number and bankruptcy filings (Hunter Aff. ¶82).[4] Mr. Hunter concluded that all 783 Loans breached the Underwriting Guidelines Rep; 581 Loans also breached the MLS Rep; 8 Loans did not comply with pertinent laws; and 274 Loans breached the Group 1 Rep (Hunter Aff. ¶7).

Mr. Hunter further concluded that each breach of the Reps resulted in an MAE (Hunter Aff. ¶¶13, 16, 19, 20). In reaching his MAE determinations, Mr. Hunter considered the effects of missing documents from loan files; DTI, LTV and CLTV deviations from Guidelines; misrepresentations of income, employment, and debt by buyers; and the "layered" effects of multiple risks when assessing whether an MAE occurred (Hunter Aff. ¶66).

At trial, Mr. Hunter testified about the purposes of underwriting and the "three Cs of credit," namely "capacity, collateral and character" (Tr. 60-72). Mr. Hunter testified at length about the factors underwriters consider, pursuant to the Guidelines, when reviewing a mortgage application, including DTI, LTV and CLTV (e.g., Tr. 65-76). Mr. Hunter also discussed various "red flags" that underwriters should be aware of, including missing or incomplete documents in the loan file, minimal borrower assets, limited borrower work experience and poor or

---

[4] DLJ asserted a standing objection to Hunter's use of post-origination sources based on relevance, hearsay, and other grounds, all of which the Court agreed to consider in connection with post-trial briefing. Both Plaintiff and Defendant submitted letter briefs during trial to address the use of post-origination evidence (NYSCEF 1128, 1129). DLJ's objection is overruled, though its arguments have been considered in determining what weight to give the evidence on a loan-by-loan basis.

unestablished credit histories (e.g., Tr. 135-139). Additionally, Mr. Hunter testified concerning the re-underwriting process, including the use of post-origination sources, such as tax documents, bankruptcy records and third-party research platforms (Tr. 140-149). Mr. Hunter also testified as to how he determined whether a defect significantly increased a Loan's risk of loss (Tr. 149-153).

Mr. Kempf did not dispute the factors considered by underwriters, including DTI, LTV and CLTV. Instead, Mr. Kempf disagreed with Hunter's methodology and findings that breaches occurred in many Loans. Mr. Kempf submits that "Mr. Hunter displays a strong bias in favor of finding alleged breaches" (Kempf Aff. ¶¶26-27). Mr. Kempf criticized Mr. Hunter's use of third-party and post-origination sources, in particular BLS data, because the underwriters did not have access to (or were not required to consider) that information, and certain Guidelines did not require them to consider such data (Kempf Aff. ¶¶31, 110, 115-122). Thus, Mr. Kempf concludes that many Loans – most notably stated income Loans – were properly underwritten based on the facts known to the underwriter.

Mr. Kemp also testified that originators worked from paper files and speculated that it was inevitable that certain documents, including stapled documents, photographs, double-sided documents, and others would be lost or not properly digitized (Tr. 1068-1069). Mr. Kempf further testified that underwriters may exercise judgment when considering a loan application and that, because there is neither a precise formula nor a mandate to consider specific documents, different underwriters could reasonably reach different conclusions as to the same loan (Tr. 662-663, 1119, 1207). Although Mr. Kempf did not concede that any breaches occurred, he found that 107 of the 783 challenged Loans were "unresolved' because he "cannot

conclude that a reasonable underwriter, based on the information we have in this loan file, could have concluded that the loan met the guidelines" (Tr. 1140; NYSCEF 1143 at Appendix D).

Plaintiff also called James Aronoff ("Aronoff") to provide opinion testimony as to the commercial understanding in the RMBS industry of, among other things, the MLS Rep (Tr. 847-878). The crux of Mr. Aronoff's testimony was that the MLS Rep warrants that the information contained in the schedule is "true" and that false information, even if caused by borrower fraud, indicates a breach of the representation.

Defendant called David Card, Ph. D ("Dr. Card") to testify concerning Hunter's use of BLS data, specifically Occupation Employment Statistics ("OES") (Tr. 1337-1394). Dr. Card's testimony was helpful concerning, among other things, how BLS data should be viewed when considering salaries in a given geographic area (*e.g.*, Loan XXXXX6228 [JX-2674] concerning the Las Vegas metropolitan area).

Finally, Plaintiff submitted a trial affidavit of Karl Snow, Ph. D ("Dr. Snow") and Defendant submitted a trial affidavit of Walter Torous, Ph. D ("Dr. Torous") on the issue of damages. The parties stipulated that Drs. Snow and Torous would not testify live but may, if necessary, testify at a post-trial damages hearing (NYSCEF 1127).

### C. The Parties' Post-Trial Submissions

Following trial, the parties settled a transcript (NYSCEF 1135 [Transcript] and 1149 [Stipulation and Order filed on October 3, 2023]). The Court afforded the parties, upon their request, approximately six-and-a-half months to complete post-trial briefing (NYSCEF 1131, 1133).

Although the trial lasted only two weeks, during which the parties focused on less than ten percent of the Loans at issue, the underlying factual record is massive. The parties submitted

tens of thousands of pages of exhibits, as well as large native format files (e.g., the MLS), few of which were actually referenced at trial. For instance, each of the 783 loan files spans hundreds (*e.g.*, JX-LF-001, 603 pages) or even thousands of pages (*e.g.*, JX-LF-531, 8,163 pages).

Plaintiff's proposed "loan-specific findings of fact" (NYSCEF 1144) consumed 1,805 pages, while Defendant's two-part counterpart (NYSCEF 1137-38) totaled 2,410 pages. Plaintiff's (NYSCEF 1142) and Defendant's (NYSCEF 1136) proposed findings of fact and conclusions of law consumed 149 pages and 120 pages, respectively. That does not include the parties' lengthy memoranda of law and their various appendices, which added hundreds more pages to the post-trial record.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Findings of Fact

Prior to trial, the parties filed a Joint Statement of Stipulated Facts and Procedural History (NYSCEF 1063). The parties also agreed to the admission of Joint Loan File Exhibits for each Loan at issue (JX-LF-001 to JX-LF-783); the applicable underwriting guidelines used by originators (the "Guidelines") (JX-001 to JX-326); other joint exhibits (JX-327 to JX-341); and loan-level exhibits underlying each expert re-underwriter's opinion (JX-2001 to JX-2783).

#### 1. The HEAT 2007-1 Trust Securitization and the Final MLS

The HEAT 2007-1 Trust closed on February 1, 2007 (Stip ¶3). The HEAT 2007-1 Prospectus Supplement ("Pro-Supp" [JX-333]) was filed with the Securities and Exchange

Commission, identifies risks for investors, and explains the roles of the parties to the Trust's governing agreements.

### a. *The MLS*

The Mortgage Loan Schedule is "a file that identifies, for each loan in a given transaction, a series of data fields about each individual loan" (Tr. 726). While the parties stipulated to the authenticity of the PSA (Tr. 94; Stip ¶8), they were unable to locate the final MLS that was supposed to be attached to the PSA and instead used "the most final loan tape" as a "proxy for the Mortgage Loan Schedule" (Tr. 95-96). The Court concludes that JX-3319 (provided in native format) was, for purposes of this trial, the final MLS (Tr. 94-97).

### b. *The Trust Includes Risky Stated Income and Subprime Loans*

As indicated on the MLS, the Trust includes several types of loans, including full documentation and reduced documentation loans, in which the underwriter reviews the borrower's income, employment, credit, assets and liabilities (Tr. 58-59). The Trust also includes many "stated income" loans, a type of reduced information loan, in which the borrower's income is not confirmed by traditional documents, such as a pay stub, a W-2, or a tax return (Tr. 165-166, 770). Further, many of the Loans in the Trust are "subprime loans," which are loans in which the borrower has "potential credit problems, historical credit problems and other issues that didn't make them as high quality as the middle or prime quality loans" (Tr. 80-81, 190).

Full documentation loans were the norm until the late 1990s, when reduced documentation, including stated income, and other types of loans were introduced to the market (Tr. 1077-1081). Reduced documentation loans, and in particular stated income loans, involve more risk than full documentation loans because the underwriter has less independently verified

[* 16]

information upon which to base their decision (Tr. 1078). To account for that risk, lenders charged higher interest rates for such loans (*see Home Equity Mtge. Tr. Series 2006-1 v DLJ Mtge. Capital, Inc.*, 62 Misc 3d 1206(A) [Sup Ct, NY County 2019] [*HEMT 1*], *affd*, 175 AD3d 1175 [1st Dept 2019] [*HEMT 2*]).

### c. *The Originators, the Guidelines and DLJ's Acquisition Channels*

The Loans in the Trust were generated by twenty-eight originators (the "Originators").[5] Each Originator has its own underwriting Guidelines which, while often similar, are not identical (Hunter Aff. ¶46, Kempf Aff. ¶48, JX-001 – JX-326).

DLJ acquired the Loans through four "Channels," including the Loan-by-Loan Channel, Mini-Bulk Channel, Bulk Channel, and Wholesale Channel (Tr. 758-764; PX-3943). Ownit Mortgage Solutions, Inc. ("Ownit"), Lime Financial Services, Ltd. ("Lime"), AEGIS Mortgage Corporation ("Aegis"), and EquiFirst Corporation ("EquiFirst") were among the largest "bulk" providers of Loans (JX-333).

---

[5] Those originators that provided many of the Loans at issue include Lime Financial, AEGIS Mortgage Corp,, EquiFirst Corporation, Aames Capital Corp, Accredited Home Lenders, Act Lending Corp., Credit Suisse Financial Corp. Wholesale Channel, Decision One Mortgage Co. Encore Credit Corp., Equity Financial, Freedom Mortgage Corporation, Funding America Mortgage Warehouse Trust I, Homeview Lending Inc., Icon Residential Capital, LLC, Lenders Direct, Meridias Lending, Millenium Funding Group, People's Choice Home Loan, Inc., Sierra Pacific Mortgage Company, South Lake Mortgage Bankers, Sunset Direct, Transcontinental Lending Group, Unprime Securities, Wilmington National (*e.g.*, PX-3967.0003-04, PX-4048.0008, PX-3963.0002-03, PX-3966.0002, PX-3958.0001, PX-4052.0002, PX-4063.0001, PX-3992.0001, PX-4143.0003, PX-3960.0001, PX-4144.0001, PX-4061.0001, PX-3969.0001-02, PX-4053.0002, PX-4051.0003, PX-4088.0008. PX-3969.0001, PX-4047.0005, PX-3974.0002-03, PX-4051.0004, PX-4051.0005, PX-4064.0001-02).

[* 17]

## 2. SPS, the Loan Servicer and Modification Agent, is a Separate Entity from DLJ with Different Obligations Under the PSA

Non-party SPS is a party to and designated in the PSA as the Servicer and Modification Oversight Agent. Prior to the closing of the Trust, in 2005, Credit Suisse, an affiliate of DLJ, acquired SPS' parent (JX-333.0043). SPS is a separate corporation from DLJ and has its own offices and staff (JX-333.0046). Neither the PSA nor the Pro-Supp indicate that SPS is an agent of DLJ.

SPS served as the Modification Oversight Agent for all loans in the Trust as well as the servicer of 79.5% of the loans originally included in the Trust (*see* PSA, JX-333.0008, JX-333.0045). In its role as Modification Oversight Agent, SPS's "only obligation" was to "approve loan modifications proposed by the servicers" (Pro-Supp at 8). In its role as servicer, SPS was "responsible for servicing the mortgage loans" including collecting payments (Pro-Supp at 45-46). As a party to the PSA, SPS was independently obligated to report its discovery, if any, of R&W breaches (PSA ¶2.03[d]). SPS is not a defendant in this case.

## 3. DLJ's Diligence Process and Repurchase Demands

DLJ performed internal pre-purchase diligence as well as post-purchase quality control ("QC") reviews for Loans acquired from each Channel (Tr. 767-769, 783-792; PX-3944 [DLJ's Parent, Credit Suisse's, RMBS *Conduit Process Control Manual*]). DLJ also retained third-party vendors and utilized "Fulfillment Centers" to perform certain diligence functions (*id.*).

DLJ utilized third-party and post-origination sources in connection with its QC process (Tr. 791-793). DLJ had a Servicing Oversight Group that included a Put-Back Group (Tr. 764-765). According to Mr. Kaiserman, if "something out of the ordinary" was learned during QC, the issue would be addressed on a case-by-case basis and may result in a repurchase request to the loan originator (Tr. 783-786; PX-4007).

[* 18]

For instance, SPS conducted Early Payment Default ("EPD") reviews of Loans in the Trust (PX-3936.0001). As a result, shortly after the Trust closed, DLJ became aware of poor performance in certain Loans and groups of Loans, including Loans that suffered an EPD as well as those originated by Sunset Direct (PX-3936.0004, .0006, PX-3937.0001, .0005).[6]

As part of its post-closing QC process, DLJ conducted monthly reviews of approximately 3% - 5% of the loans acquired from each of the acquisition Channels (PX-3943.002). Based on these reviews, DLJ created "Seller Scorecards" that identified the percentage of loans acquired from each originator with "critical issues" (*see* PX-4048 – PX-4056).

In some instances, Seller Scorecards reflected meaningful percentages (i.e., more than 20%) of loans with "Critical" defects that "could affect Investment Quality" or had "Indications of Fraud" (PX-3967.00003-0004). However, the Seller Scorecards do not identify any specific Loans that were included in the Trust or provide any indication that breaches were discovered in any of the Non-Noticed Loans.

DLJ also had a practice of conducting diligence on bulk channel loans (PX-3943.0016). Additionally, DLJ utilized "adverse sampling" of loans it considered to be at risk of breaching the Guidelines (PX-3924.0007 - .0008). The results of DLJ's adverse sampling show that some loans breached applicable Guidelines.

As a result of its diligence process, DLJ requested that Originators buy back certain non-conforming loans, in particular loans that experienced an EPD (Tr. 767-769). By December 31, 2007—less than a year after the Trust closed—DLJ made repurchase demands for one hundred

---

[6] Generally, an EPD occurs where the borrower misses one of the first three mortgage payments, is more than thirty days delinquent on a payment, or bankruptcy or foreclosure litigation is commenced (Tr. 748-749).

[* 19]

fifteen (115) loans that had been securitized in the HEAT 2007-1 Trust as a result of an EPD (PX-3939.0003).

DLJ also issued repurchase requests for violation of the Guidelines. For instance, DLJ issued repurchase requests citing missing documents in loan files (PX-4139.0002); where borrowers failed to occupy mortgaged properties as their primary residence in violation of the Guidelines (PX-4007.0001, .0013); and where employment information was inaccurate (PX-4145.0001-02).

However, DLJ's QC and diligence practices were far from laudable. DLJ's RMBS group applied "volume drivers" leading to internal conflicts (PX-3977.0001, PX-3979.0001, PX-4098). In some instances, DLJ purchased loans it knew were ineligible or were otherwise insufficient in order to maintain relationships with originators (*e.g.*, PX-3974). Some DLJ personnel referred to DLJ's diligence practices as being a "joke" or "broken" and problems as "systemic" (PX-4093.0001; PX-3930.0001; PX-3979.0001).

Internal DLJ emails from 2007 show that of a "handful of applications" reviewed, "most of the stated income loans have income that is overstated" (PX-3946.0017). DLJ personnel casually referred to stated income loans as "liar loans" in a presentation to mortgage industry personnel (PX-3948; Tr. 169-175).

DLJ also knew that other loans, including subprime and stated income loans acquired from Ownit and Aegis, presented significant risks (*e.g.*, PX-3944.0408, PX-3944.0409, PX-3924.0003, PX-3924.0003). For instance, DLJ personnel concluded in a February 2007 "Wholesale Presentation" that OwnIt used "[s]loppy lending practices" that resulted in its bankruptcy shortly before the Trust closed (PX-3946.0019).

[* 20]

a. *The Trustee Established Notice with Respect to the 303 Noticed Loans and DLJ's Independent Discovery of Breaches as to 34 of the 480 Non-Noticed Loans*

i.    The Trustee Served Pre-Suit Notice for the 303 Noticed Loans

It is undisputed that the Trustee sent two repurchase demand letters in December 2011 and March 2012 and that DLJ responded on March 5, 2012, and March 26, 2013 (Stip ¶¶36-37; JX-336, 337, 338, 341).  As a result, for purposes of the Repurchase Protocol, the Trustee has established that it provided notice as to the 303 Noticed Loans.

ii.    The Trustee Established that DLJ Independently Discovered Breaches in 34 of the 480 Non-Noticed Loans

As foreshadowed at trial, Plaintiff relied in its post-trial submissions on a significant number of provisionally admitted exhibits to demonstrate that DLJ had "actual or constructive knowledge" of a breach as to each Non-Noticed Loan (NYSCEF 1142 at 50-110).  Defendant argues that Plaintiff "resorts to cherry-picked snippets from a 'document dump at the end'" and has failed to link the generalized evidence of DLJ's alleged poor practices to the independent discovery of breaches with respect to any of the Non-Noticed Loans (NYSCEF 1147 at 24-33 quoting Tr. 1026:5-16).

In the end, the Court finds that although there was ample evidence to give rise to concern *generally* about DLJ's processes (or lack thereof), scant evidence was introduced about DLJ's knowledge or diligence with respect to the specific Non-Noticed Loans at issue in this case.  In the end, the Trustee was unable to establish that those general concerns "tie in to the 480 loans" as necessary to prove DLJ's independent discovery of breaches.

1)  *DLJ Independently Discovered Breaches in 34 Non-Noticed Loans*

In its post-trial submissions, Plaintiff asserts that DLJ received actual notice of breaches in 36 of the Non-Noticed Loans (NYSCEF 1143 at Ex. E).  The Court finds that Plaintiff has

established by a preponderance of the evidence that DLJ in fact discovered breaches in 34 of those 36 Loans.

In limited instances, DLJ discovered breaches in its own pre-purchase diligence (*e.g.*, Loan XXXXX7667 [JX-2128]) or post-purchase review (*e.g.*, Loan XXXXX5877 [JX-2006]). For example, DLJ conducted pre-purchase due diligence on Loan XXXXX1822 (JX-2402) originated by Lender's Direct and discovered that "LENDER EXCLUDED DEBTS" resulting in an artificially low DTI, and therefore a breach of the Guidelines. Similarly, DLJ conducted pre-purchase diligence on Loan XXXXX20777 (JX-2222) originated by OwnIt and determined that "INCOME DOCS DO NOT MEET GUIDELINES FOR GRADE/DOC TYPE."

Additionally, DLJ conducted a post-purchase review of Loans acquired from Sunset Direct and discovered that Loan XXXXX0595 (JX-2368) "does not meet program guidelines" because borrowers' funds were not verified, and the LTV maximums were exceeded when a seller's credit and gift were considered. Similarly, DLJ determined that Sunset Direct Loan XXXXX0490 (JX-2362) has "[i]nsufficient assets to meet reserve requirements" and, unsurprisingly, suffered an EPD. In other instances, SPS specifically advised DLJ that the relevant Loan had a "[h]igh risk of fraud" (*e.g.*, Loan XXXXX1542 [JX-2329] and Loan XXXXX0092 [JX-2607]).

The two Loans for which Plaintiff claims, and the Court rejects, that DLJ actually discovered breaches are Loan XXXXX4544 (JX-2193) and Loan XXXXX1579 (JX-2725). With respect to JX-2193, the Trustee represents only that it was REVIEWED AS PART OF BATCH 15. There is no persuasive evidence that DLJ discovered breaches as to that particular loan. With respect to JX-2725, the Trustee argues that DLJ discovered a breach "because its affiliate, Lime Financial, audited this loan. . ." While Plaintiff has introduced limited evidence

that Lime is an affiliate of DLJ (PX-4185), Plaintiff has not established by a preponderance of the evidence that the knowledge of Lime may be imputed to DLJ.

### 2) The Trustee Did Not Prove that DLJ Independently Discovered Breaches in the Remaining 444 Non-Noticed Loans

Loan XXXXX9493 (JX-2492) is an example where Plaintiff did not prove DLJ's "independent discovery" of a breach. Plaintiff contends that "DLJ discovered that this loan breached its R&Ws for two independent reasons. First, this loan was acquired from EquiFirst. . .an originator DLJ knew routinely originated loans that did not conform to applicable underwriting guidelines. . . Second, this was a subprime loan acquired through the Bulk Channel. . . which DLJ failed to diligence in direct contravention of its published policy" (NYSCEF 1144). Plaintiff's generalized allegations that DLJ knew of problems with an originator or that certain types of loans were generally problematic fall short of proving DLJ's "discovery" of a breach as to a particular loan and are instead an attempt to prove discovery based on a pervasive breach or gross negligence theory, rather than on a loan by loan basis as required.

Another example in which general allegations do not suffice to establish independent discovery is Loan XXXXX2888 (JX-2684). Plaintiff alleges that, in addition to the Loan being acquired from a specific originator, RMS, the Loan was reviewed by DLJ's Fulfillment Centers, which had "Systemic" problems, and acquired through the DLJ Conduit, which prioritized volume over quality if loans. However, even assuming that DLJ's diligence practices were *generally* deficient, Plaintiff's proffered evidence is insufficient to demonstrate independent discovery of a breach as to the particular loan at issue.

Similarly, the fact that an EPD occurred, standing alone, is not sufficient to establish discovery of a PSA breach. For instance, Plaintiff claims breaches were discovered in Loans XXXXX3034 (JX-2014) and XXXXX5464 (JX-2031) because they suffered an EPD and

[* 23]

because they were acquired from purportedly problematic originators that had been shown to have originated some (not all) deficient loans. That is insufficient. The evidence showed that DLJ sought repurchase of one hundred and fifteen (115) loans that experienced an EPD as of December 31, 2007 (PX-3939). Thus, where DLJ actually discovered a breach, it made a repurchase demand.

With respect to many Non-Noticed Loans, Plaintiff's discovery claim is limited to a general proposition that certain originators did not consistently follow the Guidelines. For instance, as to Loans XXXXX2808 (JX-2295) and Loan XXXXX7678 (JX-2131), Plaintiff's claim of discovery is based on allegations that "DLJ discovered that this loan breached its R&Ws because it was acquired from Ownit. . . an originator DLJ knew routinely originated loans that did not conform to applicable underwriting guidelines." This, again, is not sufficient and was not in any event established by a preponderance of the evidence.

Plaintiff follows the same inadequate approach to "discovery" with respect to other originators (*see* Loans XXXXX1565 [JX-2330], XXXXX1647 [JX-2338] ["DLJ discovered that this loan breached its R&Ws because it was acquired from Lime Financial. . .an originator DLJ knew routinely originated loans that did not conform to applicable underwriting guidelines"]; Loan XXXXX9222 [JX-2488] ["DLJ discovered that this loan breached its R&Ws because it was acquired from EquiFirst. . . an originator DLJ knew routinely originated loans that did not conform to applicable underwriting guidelines"]; Loan XXXXX6338 [JX-2458] [DLJ discovered that this loan breached its R&Ws because it was acquired from Aegis. . . an originator DLJ knew routinely originated loans that did not conform to applicable underwriting guidelines"]). Again, these assertions are insufficient and were not established by a preponderance of the evidence.

In some instances, Plaintiff attempts to prove DLJ's independent discovery by alleging that because a "loan was originated under a stated income documentation program to a non-self-employed borrower, a scenario DLJ knew likely resulted in the borrower overstating his income," DLJ should be deemed to have independently discovered a breach (*e.g.*, Loan XXXXX0616 [JX-2371], Loan XXXXX0756 [JX-2510]). However, there is again no "granular" proof upon which the Court may determine that DLJ knew or should have known of the alleged breaches as to particular Loans merely because they were stated income loans, subprime loans, or otherwise risky. Such a result would be inconsistent with the "loan-by-loan" analysis mandated by the Court of Appeals.

In other instances, Plaintiff adds that, because a Loan was originated through one of DLJ's "channels" or that DLJ utilized its "Fulfillment Centers" to conduct internal diligence or because it was acquired through the DLJ Conduit that DLJ discovered a breach (Loan XXXXX6798 [JX-2696] [stated income loan, acquired through the Wholesale Channel by DLJ Conduit], Loan XXXXX8806 [JX-2705] [stated income loan, acquired through the MiniBulk Channel by DLJ Conduit], Loan XXXXX0654 [JX-2055] [stated income loan, acquired through the Bulk Channel by DLJ Conduit]). Again, Plaintiffs fails to make any connection, let alone present "granular" proof, that DLJ knew or should have known of loan-specific breaches.

To be clear, the foregoing discussion does not suggest DLJ conducted effective diligence. It simply reflects the application of the Repurchase Protocol to which the parties to the PSA agreed. For better or worse, the PSA put the onus on the *Plaintiff* to provide DLJ with pre-suit notice of alleged breaches—on a loan by loan basis—which it did for 303 of the 783 loans at issue. Failing that, however, Plaintiff was required to prove—years after the fact—that DLJ knew or should have known of breaches in the individual Non-Noticed Loans, a difficult task.

Despite great effort, Plaintiff was able to meet that burden of proof in this case only as to 34 of the Non-Noticed Loans.

### B. Conclusions of Law

While few RMBS cases have gone to trial, several well-reasoned post-trial decisions provide helpful guidance, including *MBIA Ins. Corp. v Credit Suisse Sec. LLC*, 2020 NY Slip Op 33994[U], [Sup Ct, NY County 2020] [Schecter, J.] ["*MBIA*"]; *Fed. Hous. Fin. Agency v Nomura Holding Am., Inc.*, 104 F Supp 3d 441 [SDNY 2015], *affd sub nom.* 873 F3d 85 [2d Cir 2017] ["*Nomura*"]; and *U.S. Bank, N.A. v UBS Real Estate Sec. Inc.,* 205 F Supp 3d 386 [SDNY 2016] [*MARM*"]). That said, the Court's conclusions in this case are, of course, based solely on the record and arguments presented at and after trial.

### 1. *Legal Standard*

In order to establish a claim for breach of contract, Plaintiff must establish (1) the existence of a contract; (2) Plaintiff's performance; (3) Defendant's breach; (4) and resulting damages (*Harris v Seward Park Hous. Corp.,* 79 AD3d 425, 426[1st Dept 2010]). Plaintiff bears the burden of proving each of its claims by a preponderance of the evidence (*Rinaldi & Sons, Inc. v Wells Fargo Alarm Serv., Inc.*, 39 NY2d 191, 196 [1976] ["Plaintiff has the burden of proving his case by a fair preponderance of the credible evidence. If, at the close of the proofs, the evidence as a matter of logical necessity is equally balanced, plaintiff has failed to meet his burden and the cause of action is not made out"]).

With respect to the PSA's MAE requirement, "[n]ot all guideline violations are per se material. That standard would create strict liability for guideline breaches and would effectively write the material-and-adverse-effect requirement out of the PSA" (*MBIA*, 2020 NY Slip Op 33994[U] at 16). Plaintiff "bears the burden of proof" to establish a material breach and, even

[* 26]

where a technical breach is clear, the failure to prove an MAE is dispositive (*id.* at 18 [although "[t]he borrower failed to disclose $180,000 of debt. . .The effect on DTI. . .was only 52.1% when the limit was 50%"]).  However, there are no "mechanical standards" to apply when considering whether a breach is material (*MBIA,* 2020 NY Slip Op 33994[U], quoting *MARM*, 205 F Supp 3d at 405).

The Trustee's claims (including whether an MAE occurred) accrue on the closing date of the Trust (*ACE Sec. Corp. v DB Structured Products, Inc.*, 25 NY3d 581, 599 [2015]).

Finally, the individual loan Repurchase Protocol is enforced according to its terms and may not be circumvented through broad-based allegations of "pervasive breach" or "gross negligence" (*U.S. Bank N.A.*, 38 NY3d at 180, citing *Matter of Part 60 Put-Back Litig.*, 36 NY3d 342, 358 [2020] [other citations omitted]).  Thus, "this is a tree-by-tree fight" and Plaintiff bears the burden of establishing breach of contract as to each Loan at issue (Tr. 524).

### a. The Trustee Has Established Independent Discovery as to 34 of the 480 Non-Noticed Loans

In the RMBS context, notice and discovery are "alternative contractual obligations" that provide for "separate claims for breach of contract" (*U.S. Bank Nat. Ass'n,* 147 AD3d at 85]). Given the nature of RMBS cases, "at the pleading stage, information concerning breach on a 'loan-by-loan and trust-by-trust basis is 'uniquely in the possession of defendants'" (*MLRN LLC v U.S. Bank Nat. Ass'n*, 2019 NY Slip Op 33379[U], 13-14 [Sup Ct, NY County 2019], *affd sub nom.*, 2021 NY Slip Op 00025 [1st Dept 2021], *quoting BlackRock Allocation Target Shares: Series S. Portfolio v Wells Fargo Bank, National Assn.*, 247 F Supp 3d 377, 390, 389 [SDNY 2017] [noting that courts have "repeatedly rejected similar arguments by reminding litigants of the difference between sufficient pleading and successful claims"]).

[* 27]

Plaintiff may establish discovery through circumstantial evidence or by establishing willful blindness (*MARM,* 205 F Supp 3d at 425; Tr. 1422-1424). As explained by the First Department, "the allegation that defendant breached the repurchase protocol under the contract, because it knew or should have known that the loans were in breach of the warranties and representations, is sufficient to withstand a motion to dismiss. Plaintiff claims that as the originator of the mortgage loans, GreenPoint created and had full access to the loan files and either could or did perform pre- and post-closing due diligence" (*U.S. Bank Nat. Ass'n,* 147 AD3d at 86).

The Court of Appeals subsequently made clear that, regardless of whether Plaintiff seeks to establish notice or independent discovery, the determination must be made on a "loan-by-loan" basis (*U.S. Bank N.A.*, 38 NY3d at 178-179 ["The parties structured the repurchase protocol entirely through the lens of individual 'mortgage loans'—clearly contemplating a loan-by-loan approach to the agreed-upon sole remedy for breach"]).

Following the Court of Appeals remand, the First Department in this case determined that Plaintiff could not rely on CPLR 203's relation back doctrine to serve *pre*-suit notice (*U.S. Bank N.A. as Tr. of Home Equity Asset Tr. 2007-1 (HEAT 2007-1) v DLJ Mtge. Capital, Inc.*, 209 AD3d 553, 554 [1st Dept 2022]). The First Department recognized that while proof of DLJ's independent discovery may be "time-consuming or costly to gather," claims predicated on independent discovery are plausible.

In light of the foregoing authorities, the Court finds that, while a "knew or should have known standard" applies to determining "independent discovery" (unless and until that standard is revisited by the First Department or rejected by the Court of Appeals), such discovery must be shown with respect to the specific loans at issue in the case. As described in the foregoing

[* 28]

Findings of Fact, while Plaintiff has established that DLJ discovered breaches as to 34 Non-Noticed Loans, Plaintiff has not tied those findings to the remaining 436 Non-Noticed Loans, on an individual Loan (or group of identifiable Loans) basis.

Nor has Plaintiff carried its burden of establishing that SPS is an "agent" of DLJ sufficient to impute SPS' alleged knowledge of loan-specific breaches to DLJ. Plaintiff bears the burden of establishing an agency relationship (*Quik Park W. 57, LLC v Bridgewater Operating Corp.*, 148 AD3d 444, 445 [1st Dept 2017] [affirming finding that contract did not create an agency]). An agency will not be found where there is insufficient evidence to establish the agency (*Art Fin. Partners, LLC v Christie's Inc.*, 58 AD3d 469, 471 [1st Dept 2009]).

The Court warned against making new arguments in post-trial briefing that were not raised during trial. SPS is a distinct entity from DLJ, and had separate obligations under the PSA. Plaintiff's argument that SPS is an agent of DLJ sufficient to support a finding of discovery by implication as to many Non-Noticed Loans is not supported by the evidence. Accordingly, the Court holds that Plaintiff may not establish DLJ's "discovery" through imputation from SPS. Therefore, the Court finds that any breaches of R&Ws in the seventy-five (75) Loans identified in Plaintiff's Appendix J (NYSCEF 1143) cannot be deemed "discovered" by DLJ if the discovery was made solely by SPS and not communicated to DLJ.

b. *Plaintiff's Expert's Methodology was Generally Sound*

i. Legal Standard

The Court has the discretion to credit expert testimony and evaluate the competing experts' methodology (*Selkowitz v Nassau County*, 45 NY2d 97, 102 [1978 [citations omitted]; *see Am. Premier Underwriters, Inc. v Abelow*, 54 AD3d 638 [1st Dept 2008]). Re-underwriting

experts are common, if not an outright necessity, in RMBS litigations (*Phoenix Light SF Ltd.* 2020 WL 1322856, at \*4 [collecting cases]; *MBIA*, 2020 NY Slip Op 33994[U], 16).

ii.     <u>Mr. Hunter Provided a Thorough Loan-by-Loan Breach Analysis</u>

The Court rejects DLJ's broad attacks on Mr. Hunter's methodology and agrees generally with the *Nomura* court that "Hunter engaged in a careful loan by loan analysis" (*Nomura*, 104 F Supp at 520-533). The Court finds that Mr. Hunter properly considered, among things, DTI, LTV and CLTV in determining whether a breach resulting in an MAE occurred. However, the Court does not agree with all of Mr. Hunter's assertions, including that "a misrepresentation of any type is going to be material" (Tr. 151).

The Court has considered Mr. Kempf's testimony to the contrary, including that underwriters may make exceptions when issuing a loan notwithstanding underwriting guidelines; that it is plausible that a borrower's income decreased year-over-year; and that documents that are not present in the Loan Files introduced at trial were present at the time of origination. While that testimony may be relevant when assessing whether a breach occurred on a particular loan, the Court rejects Defendant's argument that all of Mr. Hunter's testimony was flawed.

The Court also rejects Mr. Kempf's speculative assertions concerning, among other things, why loan files may be missing documents or that borrowers may be inclined to lie on tax forms, bankruptcy records and in other circumstances. Even if Mr. Kempf is correct broadly about the realities of early 2000's securitizations (the effects of which continue to be felt), his testimony is not sufficient to disregard the plain wording of the PSA. However, where evidence in the loan files suggests that a missing document may have been in the file at the time of origination (e.g., partial documents, facsimile transmission sheets, receipts for appraisals that are

[\* 30]

not present, or underwriter notes), the Court may in specific instances credit Mr. Kempf's assertions that the document was obtained as required by pertinent Guidelines.

### iii. Mr. Hunter Properly Relied on Post-Origination Data

The majority of Mr. Hunter's findings depend on the Court's admission of post-origination data. New York recognizes a "professional reliability exception to the hearsay rule, which enables an expert witness to provide opinion evidence based on otherwise inadmissible hearsay, provided it is demonstrated to be the type of material commonly relied on in the profession" (*Hinlicky v Dreyfuss*, 6 NY3d 636, 648 [2006], citing *Hambsch v New York City Tr. Auth.,* 63 NY2d 723, 726[1984] and Prince, Richardson on Evidence § 7–311 [Farrell 11th ed.]). Thus, "an expert's 'opinion may be received in evidence even though some of the information on which it is based is inadmissible hearsay, if the hearsay is 'of a kind accepted in the profession as reliable in forming a professional opinion, or if it comes from a witness subject to full cross-examination on ... trial'" (*E. Fordham DE LLC v U.S. Bank N.A.*, 182 AD3d 521, 521 [1st Dept 2020], citing *Matter of Chi–Chuan Wang,* 162 AD3d 447, 449 [1st Dept 2018] [other citations omitted]).

Like the *MBIA* and *Nomura* courts, the Court concludes that the use of post-origination information, including but not limited to income and employment re-verifications, tax filings, bankruptcy records, BLS data, The Work Number ("TWN"), database reports including Data Verify, Data Tree and Accurint reports as well as other sources by Mr. Hunter, was appropriate (*MBIA* NY Slip Op 33994[U], 21-22 citing *MARM*, 205 F Supp 3d at 456; *see Phoenix Light SF Ltd. v Bank of New York Mellon*, 14-CV-10104 (VEC), 2020 WL 1322856, at *3 [SDNY Mar. 20, 2020], *on reconsideration in part,* 14-CV-10104 (VEC), 2020 WL 2765044 [SDNY May 28, 2020]). Mr. Hunter testified credibly that the aforementioned sources are widely accepted and

[* 31]

properly used the aforementioned sources in determining that DTI, LTV, CLTV and other factors, including missing documents from loan files, suggested R&W breaches (*Nomura,* 104 F Supp 3d at 523 [SDNY 2015]).  Further, Mr. Kaiserman testified that DLJ used similar post-origination data in performing QC, even if it was not specifically searching for R&W breaches.

That said, while BLS and other post-origination data may be directionally relevant in assessing breach, such evidence must be considered in the context of other evidence in the loan file.  Indeed, one court has indicated such information must be supported by "other objective information signal[ing] that the stated income was unreasonable, such as the borrower's assets and credit history" (*Phoenix Light SF Ltd.*, 2020 WL 1322856, at *4).  As explained by this Court (Friedman, J.), breaches must be proven as to "the *particular* loans" at issue and "publicly available data as to statistical salary averages (e.g., data compiled by the Bureau of Labor Statistics or other acceptable public source)" may be relevant only when compared with "salary information specific to the borrower" (*In re Part 60 Rmbs Put-Back Litig.*, 2017 NY Slip Op 32161[U], 18 [Sup Ct, NY County 2017], *affd sub nom*., 2018 NY Slip Op 07659 [1st Dept 2018]).  In sum, a finding of breach, including a breach concerning an unreasonable stated income, must be "based on adequate data" (*Phoenix Light SF Ltd.*, 2020 WL 1322856, at *4 [citations omitted]).

Although some courts have suggested something akin to a per se rule that post-origination evidence alone can never be sufficient to establish a breach (*HEMT 1*, 62 Misc 3d 1206(A); *MARM*, 205 F Supp 3d at 455), the Court does not think it necessary to apply a rigid test.  To be sure, contemporaneous evidence—when available and complete—is the most persuasive means of evaluating the underwriter's fealty to guidelines and should be accorded substantial weight.  But in the real world of old and incomplete files and objectively questionable

representations made by borrowers and others, the Court believes a holistic approach to each loan is appropriate, taking into account all credible evidence concerning the transaction.

*iv.* Mr. Hunter Provides a Sufficient MAE Analysis

Mr. Hunter testified that he assessed whether a breach resulted in an MAE by evaluating key risks in mortgage lending, including where a (1) borrower is unable or unwilling to make payments, or that in the event of a default the lender is (2) unable to recover due to insufficient collateral, or (3) legally unable to foreclose on the subject property. For instance, with respect to Loan XXXXX454 (JX-2655), Mr. Hunter explained that the minor .01% DTI violation alone was not material, but the borrower's failure to disclose a debt on a different property was material.

The Court finds that Mr. Hunter's MAE conclusions are in accord with the principle that a breach occurs on the date the Trust closes (*Finkelstein v U.S. Bank*, 2024 NY Slip Op 32072[U], 8 [Sup Ct, NY County 2024], citing *ACE Sec. Corp. v DB Structured Products, Inc.*, 25 NY3d 581, 595 [2015] ["R&W Claims, which by their terms do not survive closing, are breached, if at all, on the date of closing"]). As explained in *MBIA,* "Plaintiff is entitled to recover for any breach that significantly increases a loan's risk of loss" (2020 NY Slip Op 33994[U], 16, quoting *HEMT 2*, 175 AD3d at 1177 [breaches "need only have significantly increased a loan's risk of loss"]).

The Court finds that Mr. Hunter's testimony, along with the ample evidence in the record, suffices in many instances to demonstrate an "increased risk of loss" as required with respect to those Loans found to be in breach (*Pac. Life Ins. Co. v Bank of New York Mellon*, 17CV1388KPFRWL, 2021 WL 673479, at *17 [SDNY Feb. 22, 2021], *affd in part,* 571 F Supp

3d 106 [SDNY 2021]). Notably, a Loan need not be in default in order for the Court to determine that an MAE exists (*HEMT 1*, 62 Misc 3d 1206(A) [collecting cases]).

The Court has considered each Loan individually. As explained below, the Court has determined that certain breaches result in a material and adverse effect and that others do not.

> c. *The PSA's Representations and Warranties are Unambiguous.*
> *Plaintiff's Interpretations are Reasonable and Plaintiff Does Not Seek to*
> *Add a "No Fraud" Rep*

Both parties argue that the Reps are unambiguous. The key disputes are (1) whether misrepresentations by borrowers on Loan applications can serve as bases for breaches of the Underwriting Guidelines Rep and Prudent Underwriting/Group 1 Rep and (2) whether factually incorrect statements by DLJ on the MLS can serve as bases for breaches of the MLS Rep. The Court answers both questions in the affirmative.

At its core, the dispute is about which party bears the risk, and to what extent they bear that risk, for misrepresentations by borrowers. The Court concludes that Plaintiff's interpretations of the Reps are reasonable, track the plain language of the PSA, and are consistent with the findings in *MBIA, Nomura*, *MARM* and other well-reasoned decisions. On the other hand, Defendant's proposed interpretations seek to add terms to the PSA that would result in a transfer of risk from Defendant to Plaintiff that, if accepted, would conflict with the plain wording of the PSA.

Defendant's contention that Plaintiff seeks to add a broad "no fraud" Rep to the PSA through its interpretation of the Reps is unpersuasive. While it is true that other RMBS trust agreements contain explicit "no fraud" warranties (*e.g.*, DX-7019.0032, Tr. 716-717), there is no requirement in this that Plaintiff establish "fraud" to establish a breach of the Reps at issue.

i.   RMBS Contract Interpretation

In construing contractual language, the Court may only consider extrinsic evidence if it finds that the PSA is ambiguous (*MARM,* 205 F Supp 3d at 412-413, citing *Greenfield v Philles Records, Inc.*, 98 NY2d 562, 569 [2002]).  The PSA, like any contract, may be found to be ambiguous when both parties present "reasonable" interpretations (*Matter of Bank of New York Mellon*, 202 AD3d 465, 466 [1st Dept 2022], citing *LDIR, LLC v DB Structured Products, Inc.*, 172 AD3d 1, 4 [1st Dept 2019]).

RMBS contracts must be enforced consistent with their terms (*IKB Intl., S.A. v Wells Fargo Bank, N.A.*, 40 NY3d 277 at 285 [2023]; *MARM,* 205 F Supp 3d at 412-13).  The Court "must construe contracts in a 'manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect' [and] cannot interpret contract provisions in a way that adds, removes or distorts the meaning of any words or phrases. [The Court] must consider not only the explicit language of the agreement, but also the meaning of key terms used therein" (*W. and S. Life Ins. Co. v U.S. Bank N.A.,* 209 AD3d 6, 13 [1st Dept 2022] [collecting cases]).  The Court may also consider the omission of terms that are included in similar RMBS contracts (*Finkelstein v U.S. Bank, N.A.*, 219 AD3d 401, 402 [1st Dept 2023] [collecting cases]).  As set forth in greater detail below, the Court finds that the pertinent Reps are unambiguous, and that Plaintiff's interpretations are generally correct.

ii.   Plaintiff is not Seeking to Impose a "No Fraud" Rep

DLJ suggests that the practical effect of Plaintiff's proposed construction of the PSA is to add a broad "no fraud" representation to the agreement, which the parties chose not to include in their contract.  DLJ submits that "*IKB Intl., S.A. v Wells Fargo Bank, N.A.*, 40 NY3d 277, 288-289 [2023]] directs this Court to take into account the parties' agreement to exclude a fraud rep

[* 35]

when analyzing the scope of the reps at issue" (NYSCEF 1147 at 1). DLJ's argument is unpersuasive.

*IKB* concerned a dispute about whether a trustee had an affirmative obligation to enforce a repurchase protocol. The Court of Appeals held that although the pertinent repurchase provision gave the trustee to *ability* to enforce the repurchase protocol, it did not impose a *duty* to do so (*IKB Intl.*, 40 NY3d at 288-89 ["we hold that the 'rights referred to above' language does not impose an affirmative duty on the Trustee to enforce repurchase rights"]). In reaching its decision, the Court of Appeals found that the majority of other RMBS agreements considered included language to the effect that the trustee "shall enforce" the repurchase obligations that were not present in the repurchase agreement at issue. *IKB* did not involve a purported "no fraud" representation (or any R&W for that matter) and sheds little light on the question here, where the Court finds that the Reps are unambiguous.

More to the point, the First Department has rejected the argument that enforcing the plain language of a Rep "would in effect be tantamount to imposing a 'no fraud rep,' which [Defendant] had declined to give" (*MBIA Ins. Corp. v Credit Suisse Sec. (USA) LLC*, 165 AD3d 108, 112 [1st Dept 2018]). A similar result was reached in *HEMT 1* (62 Misc 3d 1206(A) *5). In *HEMT 1,* the Court (Scarpulla, J.) rejected DLJ's argument that using "post-origination information to prove a breach would transform the meaning of the underwriting standards warranty into a 'no fraud' warranty" and instead determined that the evidence could be used "to establish that the underwriting guidelines were not adhered to at the origination stage" (*id.*).

Consistent with that authority, the Court will enforce the contractual representations and warranties as written. The fact that the parties chose not to include a broad "no fraud" representation does not change the analysis.

iii.     Interpretation of the Representations and Warranties at Issue

The Court interprets the Representations and Warranties as set forth below.  Additionally, the Court provides examples of Loans in which the preponderance of the evidence established that there was a breach, and others in which the evidence did not establish a breach.  The examples are designed to provide context for how the Court resolved Plaintiff's claims as to the remaining Loans in which similar issues were presented (and to avoid the need for a 700-page decision).

### 1)  The Underwriting Guidelines Rep

The Underwriting Guidelines R&W provides that the Loan "complies with all the terms, conditions and requirements of the originator's underwriting standards in effect at the time of origination of such Mortgage Loan."  While the Guidelines vary by originator, many of Plaintiffs' claims assert breaches pertaining to missing required documents, DTI maximum, disposable income requirements, LTV and CLTV requirements, as well as credit requirements (Tr. at 18, 65).

As explained by Plaintiff's expert, Mr. Hunter, guidelines are established by originators to assess risk (Tr. 62-63).  In appropriate instances, an underwriter could provide an exception to the Guidelines based on appropriately documented compensating factors (Tr. 128-134 [Hunter]; 1115-1118 [Kempf]).

Mr. Kaiserman described the Underwriting Guidelines Rep as follows:

> It insured that the mortgage loan was underwritten in accordance with the applicable guidelines at the time the loan was originated based upon all the information available to the underwriter.

(Tr. 716).

The purpose of the Underwriting R&W is "ensuring that the process by which loans were underwritten was sound so that the trust would not be filled with loans that, had the underwriters reasonably done their jobs, would never have been made" (*MBIA*, 2020 NY Slip Op 33994[U], *15). For instance, the absence of required documents from a loan file may constitute a breach and corresponding MAE (*MARM,* 205 F Supp 3d at 456-57).

A misrepresentation by a borrower may—but does not always—result in a breach and MAE (*MBIA*, 2020 NY Slip Op 33994[U], * 9, *54 [DTIs that exceeded the Guidelines by only a few percentage points are "immaterial]). Post-origination information (i.e., BLS data) may be considered in conjunction with other evidence when determining whether a buyer made misrepresentation (*MBIA*, 2020 NY Slip Op 33994[U], *10, citing *MARM,* 205 F Supp 3d at 441-45; *HEMT 1,* 62 Misc 3d 1206[A] *5). However, Plaintiff must tie any claimed breach to an actual guideline (*MBIA,* 2020 NY Slip Op 33994[U], *20, citing *MARM*, 205 F Supp 3d at 456).

Simply establishing that a borrower lied or that an underwriter missed a "red flag" is not enough to constitute a breach and MAE. As testified by Mr. Hunter:

> Q. Okay. You would agree with me, sir, that BLS can't be a red flag to an underwriter if the underwriter doesn't have that information; correct?
>
> A. That's correct.

(Tr. 574).

For instance, non-primary residence claims are difficult, if not impossible to prove, without borrower testimony, given that a "statement regarding occupancy is inherently a statement of future intention" (*MARM*, 205 F Supp 3d at 431).

[* 38]

a) <u>Examples of Breaches</u>

Loan XXXXX4602 (JX-2782) is an example of where the underwriter miscalculated the borrower's income, resulting in a DTI that exceeded the pertinent Guideline. Although the loan file included the borrower's paystubs from both of their jobs, the underwriter miscalculated the income which, as recalculated by Mr. Hunter, should have generated an actual DTI of 77.02% - well above the 50% maximum imposed by the Guidelines. Loan XXXXX4602 was originated notwithstanding a multitude of other Guidelines breaches including a stale credit report, a failure to confirm legal residency, and a failure to confirm employment. Thus, the Loan materially breaches the Underwriting Guidelines, Prudent Underwriting and MLS Reps. Notably, Mr. Kemp lists this Loan as "unresolved" in his affidavit.

Loan XXXXX0434 (JX-2649) is an example of where the underwriter missed red flags and failed to obtain required documents. Specifically, the loan file includes three applications stating different incomes. The first application dated October 17, 2006, states an income of $4,680 per month; the second undated application states an income of $5,215 per month; and the final application dated October 27, 2006—the date the loan was originated—states an income of $5,510 per month—which is the income used to qualify the borrower. There is no evidence that the lender investigated red flags in the borrower's credit report, including charge-off and judgment balances. Further, the executed purchase contract is missing from the loan file, despite it being required by the applicable Guidelines, and no evidence exists to suggest that it was ever obtained. In those circumstances, the preponderance of the evidence indicates that the borrower's stated income was not reasonable and that the pertinent Guidelines were not followed resulting in a material breach.

[* 39]

Loan XXXXX1732 (JX-2529) is another example of where a missing document constitutes a material breach. The applicable Guidelines require that three months of canceled checks showing a debt payable by an obligated party be included in the loan file to exclude the debt from the DTI calculation. The pertinent loan file includes two checks, not three, as required. As a result, the debt should have been included in the DTI calculation. Therefore, the DTI was incorrect, resulting in a material breach.

Loan XXXXX0976 (JX-2397) is an example of where the loan file supports a conclusion that the Guidelines were violated. The loan file provides: "Need current VOD or current complete bank statement to evidence borrower has 2 months PITI reserves on deposit. This condition will not be modified or waived" and—while the condition is marked as cleared—there is no evidence that the borrower's assets were verified. Mr. Kempf's assertion that the missing documents may have been present at origination is pure speculation. Accordingly, Plaintiff has established a material breach of the Underwriting Guidelines Rep.

Loan XXXXX1398 (JX-2312) is an example of where a breach exists, notwithstanding the fact that an underwriter granted an exception. The loan file includes only 3 months of employment documentation even though 24 months is required by the relevant Guidelines. While the originator based the exception on LTV, that exception was improper under the guidelines, resulting in a material breach.

Loan XXXXX0286 (JX-2629), a full documentation loan, is missing several required documents and other information. Among other things, bank statements, employment verification, a final typed and signed loan application, and portions of the appraisal required by the Guidelines are missing. The file does, however, include a receipt for the appraisal, an Income Analysis Worksheet, as well as a Loan Approval and Closing Instructions. Notably, the

[* 40]

Worksheet includes numerous strikeouts in which the borrower's income is increased without explanation.

Plaintiff has established that multiple documents were missing from the Loan file, and Mr. Kempf's speculation that documents may have been lost over time is, again, insufficient. The final approval is insufficient to demonstrate that the bank statements, employment verification and loan application were all present at the time of origination. That the Worksheet was edited to increase the borrower's income presents more questions than answers. Had the Worksheet referenced specific statements, perhaps the analysis would be different.

### b) Examples of No Breach or No MAE

Loan XXXXX0889 (JX-2385), discussed at trial, is an example of post-origination evidence being insufficient to demonstrate a breach. At the time of origination in 2006, the lender verified the borrower's employment with her employer's payroll department after independently confirming the contact phone number belonged to the employer. Mr. Hunter's conclusion that the borrower misstated her employment was based mainly on notes of a conversation someone on his support staff had in 2015 with "Monique," saying only the "borrower did not work there" (JX-2385.0085; Tr. 503-04). Hunter admitted he knew nothing about Monique, her knowledge or lack thereof of the borrower's employment in 2006, or even what Monique and his staff said to each other. In those circumstances, Mr. Hunter's heavy reliance on unsupported hearsay evidence did not support a finding of breach. Plaintiff wisely withdrew this Loan from its case after trial.

Loan XXXXX7732 (JX-2141), also discussed at trial, purportedly (based on post-origination evidence, including a Data Verify report and tax documents) involved a borrower who falsely represented that she intended to occupy the subject property as a primary residence.

[* 41]

However, there were no red flags to that effect in the file, which included a Statement of Occupancy and other documents that were properly relied on in concluding that the borrower had the intent to use the property as a primary residence. In these circumstances, the Court finds that Plaintiff did not establish a breach by a preponderance of the evidence. Further, even if the DTI exceeded the Guideline maximum by 0.14%, Mr. Hunter failed to establish that an MAE resulted.

By way of example, Loan XXXXX5583 (JX-2101), Loan XXXXX1316 (JX-2519), Loan XXXXX2829 (JX-2554), and Loan XXXXX9912 (JX-2577) concern Plaintiff's DTI or LTV calculations that are less than 5% more than the Guidelines permit, and the Court does not find resulting MAEs. The Court's findings are of course limited to the facts and circumstances of this case, and indeed each individual Loan, and should not be construed as a hard and fast rule as to what constitutes an MAE in the RMBS context.

For instance, in the stated income context, certain Loans contain a Guideline that "stated income loans should be underwritten to the income stated by the borrower on the 1003" unless "the underwriter feels that the income is unreasonable" (e.g., Loans XXXXX8788 [JX-2480] and XXXXX8854 [JX-2483]). That Guideline provides significant leeway to the underwriter, and, absent evidence that the stated income was unreasonable, a Loan will not be found to be in breach. By contrast, certain Loans contain a Guideline that a stated income must be "reasonable and supported by any other docs in file" (e.g., Loan XXXXX0458 [JX-2656]). In that case, the Loan file must contain some documentary support for the stated income. Accordingly, absent any support in the Loan file, a Loan may be found to be in breach.

Similarly, as noted above, while post-origination information may be relevant, it is not always sufficient to demonstrate a breach. For instance, Plaintiff has also failed to prove a

[* 42]

breach with respect to Loan XXXXX9094 (JX-2486). The loan file includes W-2 statements and pay stubs that confirm the borrower's claimed income in 2006, when the loan closed. Hunter opines, based on information received from The Work Number in 2015, that the borrower misrepresented income when applying for the loan. Defendant argues that the information provided by TWN was obtained from a different employer than the company that employed the borrower in 2006. The information in the loan file is equivocal. While information obtained from TWN may be relevant, Plaintiff has failed to prove a breach with respect to Loan XXXXX9094 by a preponderance of the evidence.

As noted above, not all Loan files with missing documents indicate a breach of underwriting guidelines. For instance, Plaintiff has failed to prove a breach with respect to Loan XXXXX6537 (JX-2465). Plaintiff argues that necessary documents, specifically bank statements, are missing from the file. However, the loan file includes a worksheet indicating that the statements were reviewed at the time the loan was originated. Further, fax transmittal sheets in the loan file indicate that the bank statements were present at the time of origination. In those circumstances, the Court finds that the claimed missing documents are insufficient to conclude that a material breach occurred.

Finally, as stated above, the alleged breach must be tied to an actual Guideline. For instance, an alleged failure to obtain a credit explanation letter is not a breach where the guideline provides "LIME does not require Credit Explanation Letters" (Loan XXXXX1219 [JX-2296]).

### 2) The MLS Rep

The MLS Rep provides that "[t]he information set forth in the Mortgage Loan Schedule, attached to the Agreement as Schedule I, is complete, true and correct in all material respects as of the Cut-off Date." As set forth above, JX-331 is the final MLS.

Mr. Hunter submits that "the MLS Representation and Warranty addresses the accuracy of the information provided on the MLS, and covers more than merely transcription error from the loan files to the MLS" (Hunter Aff. ¶22). Mr. Aronoff contends that "the MLS Warranty clearly provides a warranty that the mortgage loan schedule was complete (i.e., it contained all of the available data), true (i.e., it reflected reality), and correct (i.e., it accurately reported the available data)" (Aronoff Aff. ¶12 [NYSCEF 1076]).

By contrast, Mr. Kaiserman testified to a very different "industry" understanding of the Rep as requiring only is that "the data set forth on the Mortgage Loan Schedule is consistent with the underlying source documents. And by 'underlying source documents', I mean things that were set forth in the loan file, like the note, the mortgage, the appraisal, the loan application, the credit report, things of that sort" (Tr. 736). In other words, Defendant takes the position that the MLS Rep simply means the information was accurately transcribed from the loan file, not that the information itself was accurate.

Like the Underwriting Guidelines Rep, the MLS Rep means what it says. As explained by Justice Schecter in *MBIA,* the MLS Rep "warrants the veracity of the loan information contained on the MLS and not simply transcription of information from one place to the other" (*MBIA,* 2020 N.Y. Slip Op. 33994[U], 7-8 [citation omitted]).[7] Plaintiff's proposed

---

[7] The Court agrees with the result in *MBIA* based on the evidence and testimony presented at trial in *this* case and does not rely on Plaintiff's collateral estoppel contention based on the prior decision.

[* 44]

interpretation is in accord with the plain meaning of the Rep, which provides that the "information" is "true and correct" and not that it was properly recorded on the MLS from the source materials (*MARM*, 205 F Supp 3d at429, quoting *Rosenthal v Quadriga Art, Inc.*, 69 AD3d 504, 507 [1st Dept 2010] [Saxe, J, concurring] ["The PSAs could have been drafted to state that the MLS reflected only an accurate transcription of the information communicated by the Originators. But there is no such limitation, and courts 'must be careful not to add new terms or alter the terms of the contract in the guise of interpreting it'"]).

DLJ's proposed interpretation, which would turn the MLS Rep into no more than a guaranty that information was properly *transcribed*, would impermissibly "add or excise terms or distort the meaning" (*Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, N.A. v Nomura Credit & Capital, Inc.*, 30 NY3d 572, 581 [2017]) of the MLS Rep, which provides in straightforward language that the information set forth on the MLS is accurate. Contrary to DLJ's argument, "this warranty is not about borrower fraud; but rather, an assurance that the underwriter did its job" (*MBIA,* 2020 N.Y. Slip. Op. 33994[U] at 9).

Contrary to DLJ's assertion, Plaintiff's proposed interpretation is neither "absurd" nor "commercially unreasonable" (*Natixis Real Estate Capital Tr. 2007-HE2 v Natixis Real Estate Holdings, LLC*, 149 AD3d 127, 139 [1st Dept 2017] quoting *Matter of Lipper Holdings v. Trident Holdings,* 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 [1st Dept.2003]).

a) <u>Examples of Breaches</u>

Loan XXXXX6176 (JX-2738) breaches both the Underwriting Guidelines Rep and MLS Rep because the underwriter miscalculated the borrower's DTI. The miscalculation results in a Guidelines breach because the loan should not have been issued, and an MLS Rep breach because Plaintiff has proven that the DTI listed on the MLS was materially incorrect.

[* 45]

Loan XXXXX1505 (JX-2324) breaches both the Underwriting Guidelines and MLS Rep because the borrower' debts were not properly calculated by the underwriter resulting in an excessive DTI. The Loan includes two MLS Rep breaches; a false DTI and an indication that it is a reduced documentation, rather than a stated income, Loan.

Loan XXXXX3893 (JX-2213) is an example of a loan in which Plaintiff has established a breach using post-origination information. Specifically, the borrower submitted a 2006 tax return and W-2 to loss mitigation, which are included in the join loan file exhibits. Based on those documents, Mr. Hunter re-calculated a DTI of 234% - well in excess of the Guidelines – which constitutes a breach and MAE.

Loan XXXXX3903 (JX-2214) breaches the MLS rep because the borrower's 2006 tax return and W-2 submitted to loss mitigation and included in the Loan file yields an actual DTI of 128.15% - well in excess of the relevant Guidelines' limit.

Loan XXXXX1439 (JX-2721) breaches the MLS Rep because a stated income loan is listed as a "Full/Alt Doc" loan. Stated income loans are riskier than full or alternative documentation loans and the distinction is material. Notably, Mr. Kempf marked this Loan "unresolved" and could not conclude that it was properly underwritten.

Loan XXXXX0915 (JX-2388) is a stated income loan but is listed in on the MLS as a reduced documentation loan, constituting a breach, because stated income loans are inherently riskier. The same mistake is present on the MLS concerning Loan XXXXX9828 (JX-2499).

b) Examples of No Breach or No MAE

Plaintiff has failed to establish an MAE in some instances in which it claims an MLS Rep breach. For instance, Loan XXXXX0627 (JX-2508) is listed on the MLS as a rate/term refinance but the actual loan purpose is a cash-out refinance. While the information is clearly

incorrect, the Court has no basis to determine that any MAE occurred and can therefore not find an actionable breach of the MLS Rep.

Similarly, with respect to Loan XXXXX1857 (JX-2408), Plaintiff has failed to establish an MLS breach based an actual DTI of 16.45% as opposed to 12.50% as recorded on the MLS as there is no MAE. The same is true with respect to Loan XXXXX8511 (JX-2012) because Plaintiff does not explain why an actual FICO score of 526 as opposed to 626 as recorded on the MLS results in an MAE. By contrast, Mr. Kempf concluded credibly that the discrepancy would have "minimal impact" and that that actual credit score was still within the Guidelines.

### 3) The Prudent Underwriting (Group 1) Rep

The Prudent Underwriting Rep, which applies only to Group 1 loans, provides that "[t]o the knowledge of the Seller [DLJ]: with respect to any Group 1 Mortgage Loan, the methodology used in underwriting the extension of credit for each such Mortgage Loan did not rely solely on the extent of the Borrower's equity in the collateral as the principal determining factor in approving such extension of credit but instead employed objective criteria such as the Borrower's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's Originator made a reasonable determination that at the time of origination the Borrower had the ability to make timely payments on the Mortgage Loan[.]"

Section 2.03(d) of the PSA provides, in relevant part, that where a Rep is "made to the best of [DLJ's] knowledge, if it is discovered by either … the Seller or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders therein, notwithstanding the Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable

representation or warranty." Contrary to DLJ's suggestion, because the Prudent Underwriting Rep is covered by §2.03 and (at a minimum) the Trustee discovered the material breaches, there is no requirement that the Trustee also prove DLJ's "knowledge" of each breach.

The Prudent Underwriting (Group 1) Rep "has little to do with borrower fraud or strict liability for inaccurate DTI and more to do with ensuring that the process by which loans were underwritten was sound so that the trust would not be filled with loans that, had the underwriters reasonably done their jobs, would never have been made" (*MBIA*, 2020 NY Slip Op 33994[U], *15).

### a) Examples of Breaches

Loan XXXXX0108 (JX-2608) is an example where Plaintiff relies on the same facts to establish Underwriting Guidelines and Prudent Underwriting (Group 1) Rep breaches. Plaintiff alleges that the (1) stated income was not reasonable; (2) the borrower misrepresented their income; (3) the borrower's disposable income did not meet the Guideline requirement; and (5) the Loan file does not support a finding that the underwriter verified the borrower's employment as required. BLS information suggest that the borrower inflated their income and tax documents submitted by the borrower to loss mitigation confirm as much. Mr. Kemp marked this loan "unresolved," and therefore cannot testify that the Loan was properly underwritten though he nevertheless concluded that no MAE resulted. The Court disagrees with the latter conclusion, given that the evidence showed, among other things, a DTI of over 100%..

Loan XXXXX8541 (JX-2476) (discussed above) contains inconsistencies about the borrower's stated income (each of which were proven to be materially overstated) and does not reflect that the borrower had two months of cash reserves to cover principal, interest, taxes, and insurance ("PITI") as required by the Guidelines. While the loan approval provides that the PITI

Guideline was satisfied, the loan file indicates that the borrower did not have any bank accounts or other assets to satisfy the condition. The absence of any evidence to suggest that the underwriter made any attempt to verify that the PITI condition was met constitutes a violation of the Prudent Underwriting Rep (Tr. 265-278).

Loan XXXXX9362 (JX-2683) includes a three-month PITI requirement but there is no evidence in the loan file that the underwriter sought to verify the borrower's alleged reserves, in violation of the Guidelines. Moreover, the loan file contains credit reports showing multiple credit inquiries in May and June of 2006, shortly before the loan was approved in August of 2006, that should have been "red flags" to the underwriter. The absence of required documents coupled with real-time evidence of red flags established a breach of the Prudent Underwriting Rep, as no objective underwriter would have approved this Loan.

Loan XXXXX9639 (JX-2496) includes a material breach because the underwriter failed to request or obtain a HUD-1 settlement statement for the purchase of the property or any documentation to support the borrower's alleged improvements to the property, resulting in an overvaluing of the property under the guidelines. Post-origination data from TWN and tax documents confirmed the multiple breaches in this Loan, including a material breach of the Prudent Underwriting (Group 1) Rep.

b) <u>Examples of No Breach or No MAE</u>

Loan XXXXX6426 (JX-2461) is an example of where Plaintiff relies on the same alleged facts, including misrepresented income, and failures to investigate red flags and acquire documents, to support its claim of both Underwriting Guidelines and Prudent Underwriting (Group 1) Rep breaches. The pertinent Loan file contains conflicting information about the borrower's income, and the pertinent guidelines did not require the underwriter to document their

[* 49]

research into credit inquiries. Moreover, the alleged second mortgage did not appear on the credit report in the Loan file. Thus, while a breach *may* have occurred, Plaintiff failed to establish a breach or an MAE by a preponderance of the evidence.

Loan XXXXX7805 (JX-2158) is another example in which Plaintiff failed to establish by a preponderance of the evidence that a Prudent Underwriting or Underwriting Guidelines breach occurred. Mr. Hunter alleges that a breach occurred based on BLS data, which the underwriter did not have, and information from TWN that the borrower's monthly income was $5,087.49, and not $5,750 as claimed. In this instance, Plaintiff did not establish by a preponderance of the evidence that the underwriter failed to rely upon objective criteria to make a reasonable determination as to the borrower's ability to repay the loan or that the underwriting relied "solely on the extent of the Borrower's equity in the collateral as the principal determining factor in approving such extension of credit."

### C. Loan-by-Loan Findings

The Court's loan-by-loan determinations are set forth below.

Section 1 lists the 8 loans that Plaintiff withdrew from the case after trial, as to which judgment shall be entered in favor of DLJ.

Section 2 lists the 443 Non-Noticed Loans as to which Plaintiff did not establish by a preponderance of the evidence that DLJ independently discovered an alleged breach, as to which judgment shall be entered in favor of DLJ.

Section 3 lists the 210 loans as to which the Court found that Plaintiff proved by a preponderance of the evidence that: (i) DLJ received timely notice of breach or independently discovered a breach; (ii) that there was a breach; and (iii) that the breach resulted in a material and adverse effect, as to which judgment shall be entered in favor of Plaintiff.

[* 50]

Finally, Section 4 lists the 122 "noticed" loans as to which the Court found that Plaintiff did not prove by a preponderance of the evidence a breach of one or more of the PSA representations and warranties that had a material adverse effect, as to which judgment shall be entered in favor of DLJ.

*1.* ***WITHDRAWN (8 LOANS)***

    *a.* <u>*Non-Noticed Loans*</u>

1. Loan XXXXX1456 (JX-2320)
2. Loan XXXXX1326 (JX-2304)
3. Loan XXXXX2221 (JX-2251)

    *b.* <u>*Noticed Loans*</u>

4. Loan XXXX462X1520 (JX-2087)
5. Loan XXXXX3571 (JX-2090)
6. Loan XXXXX2683 (JX-2692)
7. Loan XXXXX1768 (JX-2530)
8. Loan XXXXX0889 (JX-2385)

[* 52]

### 2. NON-NOTICED LOANS AS TO WHICH PLAINTIFF DID NOT ESTABLISH DLJ'S INDEPENDENT DISCOVERY OF BREACHES *(443 Loans)*

9. Loan XXXXX9493 (JX-2492) (originator/subprime)[8]

10. Loan XXXXX3034 (JX-2014) (EPD/originator)

11. Loan XXXXX5464 (JX-2031) (EPD/originator)

12. Loan XXXXX2679 (JX-2284) (originator)

13. Loan XXXXX2808 (JX-2295) (originator)

14. Loan XXXXX7678 (JX-2131) (originator)

15. Loan XXXXX1565 (JX-2330) (originator)

16. Loan XXXXX1647 (JX-2338) (originator)

17. Loan XXXXX9222 (JX-2488) (originator)

18. Loan XXXXX3803 (JX-2573) (originator/subprime)

19. Loan XXXXX5969 (JX-2437) (originator/bulk policy)

20. Loan XXXXX6338 (JX-2458) (originator)

21. Loan XXXXX4294 (JX-2092) (originator)

22. Loan XXXXX6896 (JX-2007) (originator/subprime)

23. Loan XXXXX7748 (JX-2143) (originator/bulk policy)

24. Loan XXXXX2235 (JX-2256) (originator)

25. Loan XXXXX0195 (JX-2620) (originator)

26. Loan XXXXX9810 (JX-2498) (originator)

27. Loan XXXXX2888 (JX-2684) (originator/diligence issue)

28. Loan XXXXX8621 (JX-2204) (originator/diligence issue)

29. Loan XXXXX8621 (JX-2205) (originator/diligence issue)

30. Loan XXXXX2103 (JX-2228) (originator)

31. Loan XXXXX0448 (JX-2044) (originator/stated income)

---

[8] The Court's comments for each Loan indicate Plaintiff's stated bases for determining discovery (e.g., "EPD" means that Plaintiff claims that DLJ discovered a breach because a Loan experienced an EPD; "originator" means that Plaintiff claims DLJ discovered a breach because the loan was obtained from a specific originator; and "minibulk" means that the Loan was acquired through the Mini-Bulk Channel. As explained above, those generalized bases have been considered and rejected.

[* 53]

32. Loan XXXXX2169 (JX-2240) (originator)

33. Loan XXXXX2406 (JX-2266) (originator/subprime)

34. Loan XXXXX1325 (JX-2303) (originator)

35. Loan XXXXX1410 (JX-2314) (originator/stated income)

36. Loan XXXXX1708 (JX-2347) (originator)

37. Loan XXXXX0130 (JX-2610) (originator/stated income/bulk policy)

38. Loan XXXXX0187 (JX-2619) (originator/stated income)

39. Loan XXXXX0271 (JX-2627) (originator)

40. Loan XXXXX1112 (JX-2003) (originator/stated income/EPD)

41. Loan XXXXX2950 (JX-2762) (originator/subprime)

42. Loan XXXXX9549 (JX-2494) (originator)

43. Loan XXXXX1921 (JX-2427) (originator/stated income)

44. Loan XXXXX7711 (JX-2135) (originator)

45. Loan XXXXX2241 (JX-2258) (originator)

46. Loan XXXXX2702 (JX-2292) (originator/bulk policy)

47. Loan XXXXX0360 (JX-2033) (originator)

48. Loan XXXXX7671 (JX-2129) (originator/stated income)

49. Loan XXXXX1551 (JX-2724) (originator)

50. Loan XXXXX1570 (JX-2331) (originator)

51. Loan XXXXX1585 (JX-2332) (originator/stated income)

52. Loan XXXXX1663 (JX-2340) (originator/stated income)

53. Loan XXXXX1796 (JX-2729) (originator)

54. Loan XXXXX9923 (JX-2579) (originator)

55. Loan XXXXX9959 (JX-2587) (originator/stated income/bulk channel)

56. Loan XXXXX0235 (JX-2623) (originator/stated income)

57. Loan XXXXX0436 (JX-2650) (originator/stated income)

58. Loan XXXXX0437 (JX-2651) (originator/stated income)

59. Loan XXXXX0472 (JX-2657) (originator/stated income/bulk channel)

60. Loan XXXXX1296 (JX-2517) (originator/stated income/bulk channel)

61. Loan XXXXX0928 (JX-2391) (originator/stated income/bulk channel/EPD)

62. Loan XXXXX0935 (JX-2393) (originator/stated income/bulk channel)

[* 54]

63. Loan XXXXX8846 (JX-2707) (originator/minibulk/DLJ Conduit)

64. Loan XXXXX1898 (JX-2421) (originator)

65. Loan XXXXX7807 (JX-2695) (originator/stated income/diligence/conduit)

66. Loan XXXXX2716 (JX-2108) (originator/stated income/diligence/conduit)

67. Loan XXXXX0981 (JX-2206) (originator/stated income//minibulk/DLJ Conduit)

68. Loan XXXXX0388 (JX-2036) (originator/SPS)

69. Loan XXXXX0464 (JX-2046) (originator)

70. Loan XXXXX0654 (JX-2055) (originator/stated income/Bulk)

71. Loan XXXXX0696 (JX-2058) (originator)

72. Loan XXXXX2225 (JX-2076) (originator)

73. Loan XXXXX7735 (JX-2142) (originator)

74. Loan XXXXX2029 (JX-2215) (originator)

75. Loan XXXXX2672 (JX-2282) (originator)

76. Loan XXXXX2709 (JX-2294) (originator)

77. Loan XXXXX2189 (JX-2243) (originator)

78. Loan XXXXX2249 (JX-2261) (originator/stated income/SPS)

79. Loan XXXXX2579 (JX-2274) (originator/stated income/SPS)

80. Loan XXXXX2660 (JX-2278) (originator)

81. Loan XXXXX0416 (JX-2646) (originator/bulk channel)

82. Loan XXXXX8649 (JX-2026) (no discovery alleged other than "flaws in acquisition and securitization process")

83. Loan XXXXX0489 (JX-2047) (originator/subprime)

84. Loan XXXXX0507 (JX-2048) (originator)

85. Loan XXXXX0756 (JX-2059) (originator)

86. Loan XXXXX7672 (JX-2130) (originator)

87. Loan XXXXX2691 (JX-2288) (originator)

88. Loan XXXXX2031 (JX-2216) (originator)

89. Loan XXXXX2107 (JX-2231) (originator)

90. Loan XXXXX2143 (JX-2239) (originator/stated income/subprime)

91. Loan XXXXX2547 (JX-2273) (originator)

92. Loan XXXXX0216 (JX-2621) (originator)

[* 55]

93. Loan XXXXX0641 (JX-2509) (originator)

94. Loan XXXXX2070 (JX-2540) (originator/bulk channel)

95. Loan XXXXX9587 (JX-2751) (originator)

96. Loan XXXXX3418 (JX-2568) (originator/bulk channel)

97. Loan XXXXX3041 (JX-2558) (originator/stated income/bulk channel)

98. Loan XXXXX1865 (JX-2411) (originator)

99. Loan XXXXX1900 (JX-2422) (originator/stated income)

100. Loan XXXXX9768 (JX-2106) (originator/EPD)

101. Loan XXXXX0667 (JX-2380) (originator/stated income)

102. Loan XXXXX2114 (JX-2234) (originator)

103. Loan XXXXX6809 (JX-2027) (originator/EPD)

104. Loan XXXXX4410 (JX-2171) (originator)

105. Loan XXXXX0499 (JX-2661) (originator/stated income/bulk channel)

106. Loan XXXXX1965 (JX-2537) (originator/stated income)

107. Loan XXXXX3041 (JX-2558) (originator/stated income/bulk channel)

108. Loan XXXXX8632 (JX-2478) (originator/bulk channel)

109. Loan XXXXX3217 (JX-2563) (originator/stated income/bulk channel)

110. Loan XXXXX9997 (JX-2598) (originator/bulk channel)

111. Loan XXXXX8873 (JX-2709) (originator/minibulk/DLJ Conduit)

112. Loan XXXXX1833 (JX-2405) (originator/stated income)

113. Loan XXXXX2900 (JX-2685) (originator/diligence issue)

114. Loan XXXXX8606 (JX-2200) (originator/stated income/minibulk/DLJ Conduit)

115. Loan XXXXX0659 (JX-2379) (originator)

116. Loan XXXXX7082 (JX-2008) (originator/EPD/minibulk)

117. Loan XXXXX0376 (JX-2035) (originator)

118. Loan XXXXX0389 (JX-2037) (originator)

119. Loan XXXXX7878 (JX-2152) (originator)

120. Loan XXXXX0183 (JX-2702) (originator/stated income)

121. Loan XXXXX7659 (JX-2126) (originator/bulk channel)

122. Loan XXXXX4438 (JX-2178) (originator/EPD)

123. Loan XXXXX2078 (JX-2718) (originator)

[* 56]

124.      Loan XXXXX2203 (JX-2246) (originator)

125.      Loan XXXXX2227 (JX-2253) (originator/stated income/SPS)

126.      Loan XXXXX2264 (JX-2264) (originator/SPS)

127.      Loan XXXXX2422 (JX-2267) (originator)

128.      Loan XXXXX1392 (JX-2311) (originator)

129.      Loan XXXXX1809 (JX-2359) (originator/stated income)

130.      Loan XXXXX9954 (JX-2586) (originator/stated income)

131.      Loan XXXXX9970 (JX-2593) (originator/stated income/bulk channel)

132.      Loan XXXXX0374 (JX-2639) (originator)

133.      Loan XXXXX0406 (JX-2643) (originator/stated income/bulk channel)

134.      Loan XXXXX0407 (JX-2644) (originator/stated income/bulk channel)

135.      Loan XXXXX8850 (JX-2482) (originator)

136.      Loan XXXXX0892 (JX-2386) (originator/bulk channel)

137.      Loan XXXXX0956 (JX-2394) (originator/EPD/bulk channel)

138.      Loan XXXXX5964 (JX-2433) (originator/SPS)

139.      Loan XXXXX5968 (JX-2436) (originator/SPS)

140.      Loan XXXXX6324 (JX-2741) (originator/bulk channel)

141.      Loan XXXXX6391 (JX-2743) (originator/bulk channel)

142.      Loan XXXXX4694 (JX-2096) (originator/SPS)

143.      Loan XXXXX8872 (JX-2708) (originator/minibulk/DLJ Conduit)

144.      Loan XXXXX1912 (JX-2425) (originator)

145.      Loan XXXXX1935 (JX-2430) (originator)

146.      Loan XXXXX5201 (JX-2677) (originator/diligence issue/DLJ Conduit)

147.      Loan XXXXX2921 (JX-2688) (originator/stated income/loan-by-loan channel/DLJ Conduit)

148.      Loan XXXXX2742 (JX-2694) (originator/stated income/wholesale channel/DLJ Conduit)

149.      Loan XXXXX6798 (JX-2696) originator/stated income/wholesale channel/DLJ Conduit)

150.      Loan XXXXX8788 (JX-2098) (originator/minibulk/DLJ Conduit)

151.      Loan XXXXX8890 (JX-2100) (originator/stated income/minibulk/DLJ Conduit)

[* 57]

152.     Loan XXXXX0599 (JX-2050) (originator)

153.     Loan XXXXX7837 (JX-2146) (originator/stated income)

154.     Loan XXXXX2070 (JX-2220) (originator)

155.     Loan XXXXX2682 (JX-2285) (originator)

156.     Loan XXXXX2687 (JX-2286) (originator)

157.     Loan XXXXX2708 (JX-2293) (originator)

158.     Loan XXXXX4468 (JX-2182) (originator)

159.     Loan XXXXX2033 (JX-2218) (originator)

160.     Loan XXXXX2109 (JX-2232) (originator)

161.     Loan XXXXX1400 (JX-2313) (originator/EPD)

162.     Loan XXXXX1450 (JX-2318) (originator)

163.     Loan XXXXX1712 (JX-2348) (originator/EPD)

164.     Loan XXXXX0002 (JX-2599) (originator)

165.     Loan XXXXX0012 (JX-2600) (originator)

166.     Loan XXXXX0162 (JX-2770) (originator/bulk channel)

167.     Loan XXXXX0756 (JX-2510) (originator/stated income)

168.     Loan XXXXX2914 (JX-2555) (originator/stated income/bulk channel/SPS)

169.     Loan XXXXX8580 (JX-2477) (originator)

170.     Loan XXXXX0878 (JX-2730) (originator/stated income/bulk channel)

171.     Loan XXXXX8859 (JX-2120) (originator/minibulk/DLJ Conduit)

172.     Loan XXXXX9546 (JX-2104) (originator/EPD/SPS)

173.     Loan XXXXX9547 (JX-2105) (originator/EPD/SPS)

174.     Loan XXXXX8854 (JX-2118) (originator/minibulk/DLJ Conduit)

175.     Loan XXXXX8855 (JX-2119) (originator/minibulk/DLJ Conduit)

176.     Loan XXXXX0652 (JX-2378) (originator)

177.     Loan XXXXX7704 (JX-2134) (originator/stated income/SPS)

178.     Loan XXXXX7874 (JX-2151) (originator)

179.     Loan XXXXX2213 (JX-2248) (originator)

180.     Loan XXXXX4513 (JX-2187) (originator)

181.     Loan XXXXX4536 (JX-2191) (originator)

[* 58]

182.     Loan XXXXX4544 (JX-2193) (no detail provided, Plaintiff's LSFOF provides only "REVIEWED AS PART OF BATCH 15")

183.     Loan XXXXX2061 (JX-2219) (originator)

184.     Loan XXXXX2468 (JX-2269) (originator)

185.     Loan XXXXX1596 (JX-2726) (originator)

186.     Loan XXXXX9935 (JX-2581) (originator/bulk channel)

187.     Loan XXXXX9936 (JX-2582) (originator/bulk channel)

188.     Loan XXXXX0081 (JX-2605) (originator/bulk channel/SPS)

189.     Loan XXXXX0381 (JX-2641) (originator/bulk channel/SPS)

190.     Loan XXXXX5991 (JX-2439) (originator)

191.     Loan XXXXX1875 (JX-2415) (originator/stated income)

192.     Loan XXXXX1882 (JX-2417) (originator)

193.     Loan XXXXX1904 (JX-2423) (originator)

194.     Loan XXXXX7363 (JX-2697) (originator/wholesale channel/DLJ conduit)

195.     Loan XXXXX7299 (JX-2018) (originator/EPD)

196.     Loan XXXXX7721 (JX-2138) (originator/SPS)

197.     Loan XXXXX2097 (JX-2226) (originator)

198.     Loan XXXXX4483 (JX-2184) (originator)

199.     Loan XXXXX4521 (JX-2188) (originator)

200.     Loan XXXXX4528 (JX-2189) (originator)

201.     Loan XXXXX2110 (JX-2233 (originator)

202.     Loan XXXXX2198 (JX-2245) (originator/stated income/SPS)

203.     Loan XXXXX2335 (JX-2265) (originator)

204.     Loan XXXXX1498 (JX-2323) (originator)

205.     Loan XXXXX9952 (JX-2765) (originator/EPD/stated income/bulk channel)

206.     Loan XXXXX0166 (JX-2615) (originator/stated income/SPS)

207.     Loan XXXXX0285 (JX-2628) (originator)

208.     Loan XXXXX0445 (JX-2652) (originator)

209.     Loan XXXXX0132 (JX-2755) (originator/bulk channel/SPS)

210.     Loan XXXXX1532 (JX-2521) (originator/bulk channel/SPS)

211.     Loan XXXXX3429 (JX-2015) (originator/EPD/bulk channel/SPS)

[* 59]

212. Loan XXXXX8811 (JX-2110) (originator/minibulk/DLJ Conduit)

213. Loan XXXXX8812 (JX-2111) (originator/diligence issue/stated income/DLJ Conduit)

214. Loan XXXXX8837 (JX-2114) (originator/stated income/minibulk/DLJ Conduit)

215. Loan XXXXX8868 (JX-2121) (originator/minibulk/DLJ Conduit)

216. Loan XXXXX4944 (JX-2030) (originator/EPD/bulk channel/SPS)

217. Loan XXXXX0494 (JX-2364) (originator)

218. Loan XXXXX0495 (JX-2365) (originator)

219. Loan XXXXX0499 (JX-2366) (originator/EPD)

220. Loan XXXXX0621 (JX-2373) (originator)

221. Loan XXXXX4387 (JX-2166) (originator/SPS)

222. Loan XXXXX4390 (JX-2167) (originator)

223. Loan XXXXX4400 (JX-2169) (originator)

224. Loan XXXXX3877 (JX-2212) (originator)

225. Loan XXXXX1599 (JX-2333) (originator)

226. Loan XXXXX9348 (JX-2490) (originator/bulk channel/SPS)

227. Loan XXXXX5989 (JX-2438) (originator/bulk channel)

228. Loan XXXXX6024 (JX-2443) (originator/stated income)

229. Loan XXXXX5408 (JX-2097) (originator/EPD/stated income)

230. Loan XXXXX8816 (JX-2113) (originator/stated income/minibulk/DLJ Conduit)

231. Loan XXXXX1112 (JX-2003) (originator/EPD/stated income)

232. Loan XXXXX9474 (JX-2103) (originator/EPD)

233. Loan XXXXX8102 (JX-2160) (originator/minibulk/DLJ Conduit)

234. Loan XXXXX0668 (JX-2056) (originator)

235. Loan XXXXX2191 (JX-2073) (originator/stated income)

236. Loan XXXXX2697 (JX-2289) (originator/stated income)

237. Loan XXXXX0434 (JX-2042) (originator/bulk channel)

238. Loan XXXXX4369 (JX-2161) (originator)

239. Loan XXXXX4548 (JX-2195) (originator)

240. Loan XXXXX4553 (JX-2197) (originator/stated income)

241. Loan XXXXX2528 (JX-2271) (originator)

[* 60]

242. Loan XXXXX2532 (JX-2272) (originator/SPS)

243. Loan XXXXX0146 (JX-2612) (originator)

244. Loan XXXXX0180 (JX-2771) (originator/stated income/bulk channel)

245. Loan XXXXX0182 (JX-2772) (originator)

246. Loan XXXXX0433 (JX-2648) (originator/SPS)

247. Loan XXXXX0446 (JX-2653) (originator/stated income)

248. Loan XXXXX0447 (JX-2654) (originator/stated income)

249. Loan XXXXX0594 (JX-2756) (originator/bulk channel)

250. Loan XXXXX2579 (JX-2548) (originator/stated income/bulk channel)

251. Loan XXXXX8965 (JX-2485) (originator)

252. Loan XXXXX9963 (JX-2589) (originator/stated income/bulk channel)

253. Loan XXXXX0200 (JX-2773) (originator)

254. Loan XXXXX8813 (JX-2112) (originator/diligence issue/stated income/DLJ

Conduit)

255. Loan XXXXX1863 (JX-2410) (originator/SPS)

256. Loan XXXXX5429 (JX-2676) (originator/loan-by-loan/SLJ Conduit)

257. Loan XXXXX0374 (JX-2639) (originator)

258. Loan XXXXX0616 (JX-2371) (originator/stated income)

259. Loan XXXXX0617 (JX-2372) (originator/stated income)

260. Loan XXXXX2665 (JX-2280) (originator/stated income)

261. Loan XXXXX2700 (JX-2291) (originator/SPS)

262. Loan XXXXX0609 (JX-2052) (originator)

263. Loan XXXXX2204 (JX-2075) (originator)

264. Loan XXXXX4414 (JX-2173) (originator)

265. Loan XXXXX4448 (JX-2179) (originator/stated income)

266. Loan XXXXX2081 (JX-2223) (originator)

267. Loan XXXXX2184 (JX-2242) (originator/bulk channel)

268. Loan XXXXX2234 (JX-2255) (originator/SPS)

269. Loan XXXXX2600 (JX-2275) (originator)

270. Loan XXXXX2637 (JX-2276) (originator)

271. Loan XXXXX1704 (JX-2346) (originator/SPS)

[* 61]

272.    Loan XXXXX9984 (JX-2597) (originator)

273.    Loan XXXXX1566 (JX-2759) (originator)

274.    Loan XXXXX0909 (JX-2387) (originator/bulk channel)

275.    Loan XXXXX1836 (JX-2406) (originator/stated income)

276.    Loan XXXXX1870 (JX-2412) (originator/stated income)

277.    Loan XXXXX9671 (JX-2690) (originator/stated income/loan-by-loan/DLJ Conduit)

278.    Loan XXXXX7291 (JX-2017) (originator/EPD)

279.    Loan XXXXX2707 (JX-2107) (originator/minibulk/DLJ Conduit)

280.    Loan XXXXX0615 (JX-2370) (originator)

281.    Loan XXXXX0701 (JX-2383) (originator)

282.    Loan XXXXX7155 (JX-2009) (originator/EPD)

283.    Loan XXXXX6958 (JX-2028) (originator/bulk channel)

284.    Loan XXXXX0449 (JX-2045) (originator)

285.    Loan XXXXX2640 (JX-2084) (originator)

286.    Loan XXXXX2662 (JX-2279) (originator/stated income)

287.    Loan XXXXX2676 (JX-2283) (originator)

288.    Loan XXXXX4377 (JX-2163) (originator)

289.    Loan XXXXX4412 (JX-2172) (originator)

290.    Loan XXXXX4487 (JX-2185) (originator/SPS)

291.    Loan XXXXX4535 (JX-2190) (originator)

292.    Loan XXXXX1672 (JX-2342) (originator)

293.    Loan XXXXX1973 (JX-2539) (originator/stated income/SPS)

294.    Loan XXXXX1887 (JX-2418) (originator/stated income)

295.    Loan XXXXX1895 (JX-2419) (originator/stated income/SPS)

296.    Loan XXXXX7792 (JX-2156) (originator/stated income/minibulk/DLJ Conduit/SPS)

297.    Loan XXXXX0493 (JX-2363) (originator)

298.    Loan XXXXX2194 (JX-2074) (originator/SPS)

299.    Loan XXXXX2493 (JX-2270) (originator)

300.    Loan XXXXX2699 (JX-2290) (originator)

[* 62]

301.    Loan XXXXX2237 (JX-2077) (originator)

302.    Loan XXXXX4481 (JX-2183) (originator)

303.    Loan XXXXX4558 (JX-2198) (originator/SPS)

304.    Loan XXXXX2072 (JX-2221) (originator/stated income)

305.    Loan XXXXX2106 (JX-2230) (originator)

306.    Loan XXXXX2215 (JX-2249) (originator/SPS)

307.    Loan XXXXX2247 (JX-2259) (originator)

308.    Loan XXXXX2261 (JX-2263) (originator/SPS)

309.    Loan XXXXX1388 (JX-2309) (originator)

310.    Loan XXXXX1389 (JX-2310) (originator)

311.    Loan XXXXX1610 (JX-2334) (originator/stated income)

312.    Loan XXXXX9971 (JX-2594) (originator/bulk channel)

313.    Loan XXXXX0160 (JX-2769) (originator/stated income)

314.    Loan XXXXX0304 (JX-2631) (originator)

315.    Loan XXXXX0314 (JX-2505) (originator/stated income/bulk channel)

316.    Loan XXXXX2388 (JX-2545) (originator/stated income/bulk channel)

317.    Loan XXXXX3651 (JX-2570) (originator/stated income/bulk channel)

318.    Loan XXXXX0885 (JX-2731) (originator/bulk channel)

319.    Loan XXXXX6339 (JX-2742) (originator/bulk channel)

320.    Loan XXXXX0420 (JX-2040) (originator/stated income/bulk channel)

321.    Loan XXXXX0683 (JX-2057) (originator)

322.    Loan XXXXX7718 (JX-2137) (originator/stated income)

323.    Loan XXXXX4464 (JX-2181) (originator)

324.    Loan XXXXX2222 (JX-2252) (originator)

325.    Loan XXXXX2228 (JX-2254) (originator/stated income/SPS)

326.    Loan XXXXX3896 (JX-2717) (originator)

327.    Loan XXXXX1241 (JX-2720) (originator/stated income)

328.    Loan XXXXX1637 (JX-2337) (originator)

329.    Loan XXXXX1190 (JX-2514) (originator/stated income)

330.    Loan XXXXX9233 (JX-2489) (originator/bulk channel/SPS)

331.    Loan XXXXX0996 (JX-2400) (originator/bulk channel/SPS)

[* 63]

332. Loan XXXXX8871 (JX-2122) (originator/stated income/EPD/minibulk/diligence issue/SPS)

333. Loan XXXXX7808 (JX-2159) (originator/minibulk/DLJ Conduit)

334. Loan XXXXX0518 (JX-2049) (originator/stated income)

335. Loan XXXXX2248 (JX-2260) (originator/stated income)

336. Loan XXXXX1661 (JX-2339) (originator)

337. Loan XXXXX1740 (JX-2352) (originator)

338. Loan XXXXX1741 (JX-2353) (originator)

339. Loan XXXXX9985 (JX-2752) (originator/bulk channel/SPS)

340. Loan XXXXX0321 (JX-2506) (originator)

341. Loan XXXXX0615 (JX-2757) (originator)

342. Loan XXXXX8805 (JX-2481) (originator/bulk channel/SPS)

343. Loan XXXXX0673 (JX-2381) (originator)

344. Loan XXXXX7922 (JX-2154) (originator/stated income)

345. Loan XXXXX2666 (JX-2281) (originator/bulk channel/SPS)

346. Loan XXXXX7661 (JX-2127) (originator/stated income)

347. Loan XXXXX4371 (JX-2162) (originator)

348. Loan XXXXX4394 (JX-2168) (originator/SPS)

349. Loan XXXXX4403 (JX-2170) (originator)

350. Loan XXXXX2132 (JX-2238) (originator)

351. Loan XXXXX2193 (JX-2244) (originator/SPS)

352. Loan XXXXX1728 (JX-2351) (originator)

353. Loan XXXXX0918 (JX-2389) (originator/stated income/bulk channel/SPS)

354. Loan XXXXX6591 (JX-2474) (originator)

355. Loan XXXXX6592 (JX-2475) (originator)

356. Loan XXXXX8841 (JX-2116) (originator/minibulk/DLJ Conduit)

357. Loan XXXXX8842 (JX-2117) (originator/minibulk/DLJ Conduit)

358. Loan XXXXX1925 (JX-2428) (originator/SPS)

359. Loan XXXXX5891 (JX-2678) (originator/stated income/EPD/loan-by-loan/DLJ Conduit)

360. Loan XXXXX7096 (JX-2016) (originator/EPD)

[* 64]

361.        Loan XXXXX0675 (JX-2382) (originator)

362.        Loan XXXXX0616 (JX-2053) (originator)

363.        Loan XXXXX4452 (JX-2180) (originator)

364.        Loan XXXXX2119 (JX-2236) (originator)

365.        Loan XXXXX9906 (JX-2763) (originator/stated income)

366.        Loan XXXXX0342 (JX-2634) (originator/stated income)

367.        Loan XXXXX0343 (JX-2635) (originator/stated income)

368.        Loan XXXXX1641 (JX-2526) (originator/bulk channel)

369.        Loan XXXXX9180 (JX-2487) (originator/bulk channel)

370.        Loan XXXXX4099 (JX-2005) (stated income/bulk channel)

371.        Loan XXXXX6573 (JX-2471)) (originator/bulk channel)

372.        Loan XXXXX0634 (JX-2376) (originator)

373.        Loan XXXXX4380 (JX-2164) (originator)

374.        Loan XXXXX4542 (JX-2192) (originator)

375.        Loan XXXXX4547 (JX-2194) (originator/SPS)

376.        Loan XXXXX2220 (JX-2250) (originator/SPS)

377.        Loan XXXXX9969 (JX-2592) (originator/stated income/SPS)

378.        Loan XXXXX0584 (JX-2701) (originator/stated income/EPD)

379.        Loan XXXXX4099 (JX-2005) (stated income/bulk channel)

380.        Loan XXXXX6668 (JX-2715) (originator)

381.        Loan XXXXX2237 (JX-2257) (originator/SPS)

382.        Loan XXXXX2689 (JX-2287) (originator/SPS)

383.        Loan XXXXX2440 (JX-2019) (originator/stated income/SPS)

384.        Loan XXXXX4417 (JX-2174) (originator)

385.        Loan XXXXX4551 (JX-2196) (originator)

386.        Loan XXXXX4564 (JX-2199) (originator)

387.        Loan XXXXX2123 (JX-2761) (originator/stated income/bulk channel/SPS)

388.        Loan XXXXX3513 (JX-2569) (originator/stated income/SPS)

389.        Loan XXXXX0647 (JX-2377) (originator)

390.        Loan XXXXX0625 (JX-2054) (originator/stated income)

391.        Loan XXXXX2092 (JX-2224) (originator/SPS)

[* 65]

392.	Loan XXXXX1539 (JX-2327) (originator)

393.	Loan XXXXX1540 (JX-2328) (originator)

394.	Loan XXXXX0233 (JX-2503) (originator/bulk channel)

395.	Loan XXXXX6572 (JX-2470) (originator/bulk channel)

396.	Loan XXXXX0633 (JX-2375) (originator)

397.	Loan XXXXX0757 (JX-2060) (originator)

398.	Loan XXXXX7726 (JX-2139) (originator)

399.	Loan XXXXX7708 (JX-2711) (originator)

400.	Loan XXXXX4433 (JX-2177) (originator/SPS)

401.	Loan XXXXX4510 (JX-2186) (originator)

402.	Loan XXXXX2105 (JX-2229) (originator)

403.	Loan XXXXX2174 (JX-2241) (originator)

404.	Loan XXXXX2209 (JX-2247) (originator)

405.	Loan XXXXX1357 (JX-2307) (originator/SPS)

406.	Loan XXXXX6086 (JX-2737) (originator)

407.	Loan XXXXX8806 (JX-2705) (originator/minibulk/DLJ Conduit)

408.	Loan XXXXX0507 (JX-2367) (originator)

409.	Loan XXXXX0414 (JX-2703) (originator)

410.	Loan XXXXX4424 (JX-2175) (originator/SPS)

411.	Loan XXXXX4427 (JX-2176) (originator)

412.	Loan XXXXX1678 (JX-2344) (originator/stated income)

413.	Loan XXXXX1782 (JX-2356) (originator/stated income)

414.	Loan XXXXX0016 (JX-2753) (originator/stated income/SPS)

415.	Loan XXXXX1807 (JX-2531) (originator/stated income)

416.	Loan XXXXX0968 (JX-2396) (originator/bulk channel)

417.	Loan XXXXX6085 (JX-2736) (originator)

418.	Loan XXXXX4939 (JX-2029) (originator/stated income/EPD)

419.	Loan XXXXX0602 (JX-2051) (originator/SPS)

420.	Loan XXXXX0426 (JX-2041) (originator)

421.	Loan XXXXX4381 (JX-2165) (originator/SPS)

422.	Loan XXXXX2100 (JX-2227) (originator/stated income)

[* 66]

423. Loan XXXXX2151 (JX-2719) (originator)

424. Loan XXXXX1303 (JX-2518) (originator/bulk channel/SPS)

425. Loan XXXXX0992 (JX-2398) (originator/bulk channel)

426. Loan XXXXX0993 (JX-2399) (originator/bulk channel)

427. Loan XXXXX2093 (JX-2225) (originator/stated income

428. Loan XXXXX0623 (JX-2374) (originator/EPD/bulk channel/SPS)

429. Loan XXXXX2118 (JX-2235) (originator/bulk channel)

430. Loan XXXXX1953 (JX-2536) (originator/SPS)

431. Loan XXXXX8838 (JX-2115) (originator/minibulk/DLJ Conduit)

432. Loan XXXXX2032 (JX-2217) (originator/SPS)

433. Loan XXXXX2251 (JX-2262) (originator)

434. Loan XXXXX1286 (JX-2299) (originator/stated income)

435. Loan XXXXX1287 (JX-2300) (originator/stated income)

436. Loan XXXXX1669 (JX-2341) (no information provided)

437. Loan XXXXX1872 (JX-2413) (originator)

438. Loan XXXXX7839 (JX-2147) (originator/stated income/SPS)

439. Loan XXXXX2649 (JX-2277) (originator/bulk channel)

440. Loan XXXXX0328 (JX-2775) (originator/stated income/SPS)

441. Loan XXXXX0329 (JX-2776) (originator/stated income/SPS)

442. Loan XXXXX1873 (JX-2732) (originator/stated income)

443. Loan XXXXX0927 (JX-2390) (originator/stated income/bulk channel/SPS)

444. Loan XXXXX0185 (JX-2617) (originator/stated income)

445. Loan XXXXX0186 (JX-2618) (originator/stated income)

446. Loan XXXXX8800 (JX-2109) (originator/stated income/minibulk/DLJ Conduit)

447. Loan XXXXX4392 (JX-2713) (originator)

448. Loan XXXXX2437 (JX-2268) (originator/bulk channel)

449. Loan XXXXX7798 (JX-2157) (originator/minibulk/DLJ Conduit)

450. Loan XXXXX1579 (JX-2725) (no proof that Lime Financial provided notice to DLJ as an "affiliate")

451. Loan XXXXX0469 (JX-2361) (originator/SPS)

[* 67]

### 3. *LOANS AS TO WHICH PLAINTIFF SATISFIED THE REPURCHASE PROTOCOL <u>AND</u> PROVED BREACH WITH MATERIAL ADVERSE EFFECT (210 LOANS)*

*(a) Non-noticed Loans (independently discovered by DLJ) (34 Loans)*

452.  Loan XXXXX7667 (JX-2128)

453.  Loan XXXXX1713 (JX-2349)

454.  Loan XXXXX5877 (JX-2006)

455.  Loan XXXXX2612 (JX-2083)

456.  Loan XXXXX0363 (JX-2034)

457.  Loan XXXXX0092 (JX-2607)

458.  Loan XXXXX1930 (JX-2429)

459.  Loan XXXXX1451 (JX-2319)

460.  Loan XXXXX9941 (JX-2584)

461.  Loan XXXXX9942 (JX-2585)

462.  Loan XXXXX1461 (JX-2321)

463.  Loan XXXXX1464 (JX-2322)

464.  Loan XXXXX1542 (JX-2329)

465.  Loan XXXXX2176 (JX-2542)

466.  Loan XXXXX7921 (JX-2153)

467.  Loan XXXXX1252 (JX-2297)

468.  Loan XXXXX5966 (JX-2435)

469.  Loan XXXXX1822 (JX-2402)

470.  Loan XXXXX2077 (JX-2222)

471.  Loan XXXXX1266 (JX-2298)

472.  Loan XXXXX9967 (JX-2590)

473.  Loan XXXXX9968 (JX-2591)

474.  Loan XXXXX0142 (JX-2767)

475.  Loan XXXXX2252 (JX-2078)

476.  Loan XXXXX2123 (JX-2237)

477.  Loan XXXXX1434 (JX-2316)

478.  Loan XXXXX1435 (JX-2317)

[* 68]

479.     Loan XXXXX0490 (JX-2362)

480.     Loan XXXXX1823 (JX-2403)

481.     Loan XXXXX9978 (JX-2595)

482.     Loan XXXXX9979 (JX-2596)

483.     Loan XXXXX9089 (JX-2747)

484.     Loan XXXXX8874 (JX-2710)

485.     Loan XXXXX0595 (JX-2368)

### (b) Noticed Loans (175 Loans)

486.     Loan XXXXX5042 (JX-2023)

487.     Loan XXXXX8372 (JX-2675)

488.     Loan XXXXX0418 (JX-2647)

489.     Loan XXXXX0770 (JX-2061)

490.     Loan XXXXX0803 (JX-2062)

491.     Loan XXXXX1497 (JX-2066)

492.     Loan XXXXX1967 (JX-2072)

493.     Loan XXXXX2565 (JX-2082)

494.     Loan XXXXX7799 (JX-2144)

495.     Loan XXXXX6654 (JX-2207)

496.     Loan XXXXX6655 (JX-2208)

497.     Loan XXXXX6660 (JX-2210)

498.     Loan XXXXX6667 (JX-2211)

499.     Loan XXXXX5501 (JX-2672)

500.     Loan XXXXX1567 (JX-2760)

501.     Loan XXXXX7635 (JX-2124)

502.     Loan XXXXX1255 (JX-2516)

503.     Loan XXXXX0215 (JX-2032)

504.     Loan XXXXX6127 (JX-2451)

505.     Loan XXXXX1695 (JX-2345)

506.     Loan XXXXX1621 (JX-2727)

507.     Loan XXXXX5941 (JX-2734)

508.     Loan XXXXX5943 (JX-2735)

[* 69]

509. Loan XXXXX0238 (JX-2624)

510. Loan XXXXX454 (JX-2655)

511. Loan XXXXX0377 (JX-2640)

512. Loan XXXXX0408 (JX-2645)

513. Loan XXXXX2113 (JX-2541)

514. Loan XXXXX2420 (JX-2546)

515. Loan XXXXX6659 (JX-2209)

516. Loan XXXXX0017 (JX-2601)

517. Loan XXXXX7639 (JX-2125)

518. Loan XXXXX6176 (JX-2738)

519. Loan XXXXX9534 (JX-2750)

520. Loan XXXXX1505 (JX-2324)

521. Loan XXXXX1536 (JX-2326)

522. Loan XXXXX1756 (JX-2069)

523. Loan XXXXX1653 (JX-2527)

524. Loan XXXXX1654 (JX-2528)

525. Loan XXXXX3421 (JX-2088)

526. Loan XXXXX2241 (JX-2544)

527. Loan XXXXX7386 (JX-2698)

528. Loan XXXXX0148 (JX-2768)

529. Loan XXXXX0028 (JX-2766)

530. Loan XXXXX0973 (JX-2758)

531. Loan XXXXX6663 (JX-2714)

532. Loan XXXXX0114 (JX-2609)

533. Loan XXXXX1768 (JX-2070)

534. Loan XXXXX7923 (JX-2155)

535. Loan XXXXX0956 (JX-2513)

536. Loan XXXXX2548 (JX-2547)

537. Loan XXXXX0937 (JX-2001)

538. Loan XXXXX2828 (JX-2553)

539. Loan XXXXX2760 (JX-2552)

540.	Loan XXXXX2270 (JX-2080)

541.	Loan XXXXX1942 (JX-2535)

542.	Loan XXXXX8862 (JX-2099)

543.	Loan XXXXX3132 (JX-2783)

544.	Loan XXXXX7906 (JX-2666)

545.	Loan XXXXX0923 (JX-2512)

546.	Loan XXXXX0458 (JX-2656)

547.	Loan XXXXX1864 (JX-2071)

548.	Loan XXXXX6295 (JX-2456)

549.	Loan XXXXX6537 (JX-2465)

550.	Loan XXXXX1732 (JX-2529)

551.	Loan XXXXX3338 (JX-2566)

552.	Loan XXXXX0022 (JX-2501)

553.	Loan XXXXX3828 (JX-2575)

554.	Loan XXXXX1398 (JX-2312)

555.	Loan XXXXX7729 (JX-2140)

556.	Loan XXXXX6393 (JX-2459)

557.	Loan XXXXX9876 (JX-2500)

558.	Loan XXXXX1969 (JX-2538)

559.	Loan XXXXX3307 (JX-2565)

560.	Loan XXXXX0483 (JX-2781)

561.	Loan XXXXX8983 (JX-2746)

562.	Loan XXXXX8833 (JX-2706)

563.	Loan XXXXX6584 (JX-2472)

564.	Loan XXXXX6585 (JX-2473)

565.	Loan XXXXX1630 (JX-2336)

566.	Loan XXXXX6075 (JX-2448)

567.	Loan XXXXX6204 (JX-2455)

568.	Loan XXXXX0976 (JX-2397)

569.	Loan XXXXX0254 (JX-2504)

570.	Loan XXXXX2196 (JX-2543)

571.	Loan XXXXX5704 (JX-2691)

572.	Loan XXXXX1067 (JX-2002)

573.	Loan XXXXX0286 (JX-2629)

574.	Loan XXXXX1727 (JX-2350)

575.	Loan XXXXX0331 (JX-2632)

576.	Loan XXXXX0332 (JX-2633)

577.	Loan XXXXX3619 (JX-2021)

578.	Loan XXXXX1439 (JX-2721)

579.	Loan XXXXX1440 (JX-2722)

580.	Loan XXXXX1698 (JX-2728)

581.	Loan XXXXX4602 (JX-2782)

582.	Loan XXXXX0403 (JX-2039)

583.	Loan XXXXX2253 (JX-2079)

584.	Loan XXXXX7845 (JX-2148)

585.	Loan XXXXX6516 (JX-2463)

586.	Loan XXXXX2623 (JX-2549)

587.	Loan XXXXX1518 (JX-2723)

588.	Loan XXXXX1653 (JX-2704)

589.	Loan XXXXX0346 (JX-2636)

590.	Loan XXXXX0365 (JX-2637)

591.	Loan XXXXX0366 (JX-2638)

592.	Loan XXXXX1521 (JX-2067)

593.	Loan XXXXX6051 (JX-2445)

594.	Loan XXXXX6092 (JX-2449)

595.	Loan XXXXX0590 (JX-2507)

596.	Loan XXXXX1825 (JX-2532)

597.	Loan XXXXX3130 (JX-2560)

598.	Loan XXXXX3644 (JX-2091)

599.	Loan XXXXX5404 (JX-2682)

600.	Loan XXXXX8583 (JX-2013)

601.	Loan XXXXX2047 (JX-2004)

[* 72]

602.     Loan XXXXX3816 (JX-2574)

603.     Loan XXXXX0915 (JX-2388)

604.      Loan XXXXX4532 (JX-2095)

605.     Loan XXXXX0038 (JX-2502)

606.     Loan XXXXX6896 (JX-2663)

607.     Loan XXXXX7714 (JX-2136)

608.     Loan XXXXX1559 (JX-2522)

609.     Loan XXXXX1560 (JX-2523)

610.     Loan XXXXX6052 (JX-2679)

611.     Loan XXXXX5422 (JX-2690)

612.     Loan XXXXX9598 (JX-2700)

613.     Loan XXXXX8608 (JX-2201)

614.     Loan XXXXX9792 (JX-2497)

615.     Loan XXXXX7107 (JX-2665)

616.     Loan XXXXX3840 (JX-2716)

617.     Loan XXXXX1939 (JX-2733)

618.     Loan XXXXX3903 (JX-2214)

619.     Loan XXXXX5951 (JX-2431)

620.     Loan XXXXX5952 (JX-2432)

621.     Loan XXXXX8888 (JX-2484)

622.     Loan XXXXX9532 (JX-2493)

623.     Loan XXXXX3487 (JX-2089)

624.     Loan XXXXX8935 (JX-2670)

625.      Loan XXXXX0108 (JX-2608)

626.     Loan XXXXX9950 (JX-2764)

627.     Loan XXXXX0279 (JX-2774)

628.     Loan XXXXX0434 (JX-2649)

629.     Loan XXXXX8541 (JX-2476)

630.     Loan XXXXX9381 (JX-2491)

631.     Loan XXXXX3702 (JX-2571)

632.      Loan XXXXX7017 (JX-2664)

[* 73]

INDEX NO. 650369/2013

NYSCEF DOC. NO. 1150

RECEIVED NYSCEF: 12/31/2024

633. Loan XXXXX0288 (JX-2630)

634. Loan XXXXX0884 (JX-2384)

635. Loan XXXXX9362 (JX-2683)

636. Loan XXXXX8608 (JX-2024)

637. Loan XXXXX8609 (JX-2025)

638. Loan XXXXX0347 (JX-2779)

639. Loan XXXXX0432 (JX-2780)

640. Loan XXXXX0104 (JX-2754)

641. Loan XXXXX3893 (JX-2213)

642. Loan XXXXX6893 (JX-2662)

643. Loan XXXXX1811 (JX-2360)

644. Loan XXXXX0338 (JX-2777)

645. Loan XXXXX0340 (JX-2778)

646. Loan XXXXX6250 (JX-2739)

647. Loan XXXXX6311 (JX-2740)

648. Loan XXXXX1568 (JX-2068)

649. Loan XXXXX8725 (JX-2745)

650. Loan XXXXX0957 (JX-2395)

651. Loan XXXXX1805 (JX-2357)

652. Loan XXXXX2639 (JX-2550)

653. Loan XXXXX8105 (JX-2712)

654. Loan XXXXX6083 (JX-2689)

655. Loan XXXXX9442 (JX-2749)

656. Loan XXXXX3723 (JX-2572)

657. Loan XXXXX9639 (JX-2496)

658. Loan XXXXX6049 (JX-2444)

659. Loan XXXXX9256 (JX-2748)

660. Loan XXXXX8577 (JX-2744)

661. Loan XXXXX0025 (JX-2602)

### 4. *NOTICED LOANS AS TO WHICH PLAINTIFF FAILED TO PROVE BREACH WITH MATERIAL ADVERSE EFFECT* (122 Loans)

662. Loan XXXXX1380 (JX-2308)

663. Loan XXXXX7853 (JX-2150)

664. Loan XXXXX1429 (JX-2315)

665. Loan XXXXX1674 (JX-2343)

666. Loan XXXXX2650 (JX-2085)

667. Loan XXXXX1915 (JX-2426)

668. Loan XXXXX3619 (JX-2681)

669. Loan XXXXX8679 (JX-2667)

670. Loan XXXXX1338 (JX-2306)

671. Loan XXXXX1507 (JX-2325)

672. Loan XXXXX9928 (JX-2580)

673. Loan XXXXX0222 (JX-2622)

674. Loan XXXXX6010 (JX-2440)

675. Loan XXXXX6178 (JX-2452)

676. Loan XXXXX8646 (JX-2479)

677. Loan XXXXX8788 (JX-2480)

678. Loan XXXXX8854 (JX-2483)

679. Loan XXXXX0627 (JX-2508)

680. Loan XXXXX1232 (JX-2515)

681. Loan XXXXX1632 (JX-2525)

682. Loan XXXXX1861 (JX-2533)

683. Loan XXXXX2917 (JX-2556)

684. Loan XXXXX1830 (JX-2404)

685. Loan XXXXX7617 (JX-2673)

686. Loan XXXXX1857 (JX-2408)

687. Loan XXXXX8511 (JX-2012)

688. Loan XXXXX5583 (JX-2101)

689. Loan XXXXX1316 (JX-2519)

690. Loan XXXXX6414 (JX-2460)

[* 75]

691.     Loan XXXXX9910 (JX-2576)

692.     Loan XXXXX9912 (JX-2577)

693.     Loan XXXXX7847 (JX-2149)

694.     Loan XXXXX2829 (JX-2554)

695.     Loan XXXXX5587 (JX-2102)

696.     Loan XXXXX6700 (JX-2669)

697.     Loan XXXXX1852 (JX-2407)

698.     Loan XXXXX1219 (JX-2296)

699.     Loan XXXXX9913 (JX-2578)

700.     Loan XXXXX0082 (JX-2606)

701.     Loan XXXXX3681 (JX-2022)

702.     Loan XXXXX7698 (JX-2133)

703.     Loan XXXXX6062 (JX-2446)

704.     Loan XXXXX6065 (JX-2447)

705.     Loan XXXXX6568 (JX-2467)

706.     Loan XXXXX6569 (JX-2468)

707.     Loan XXXXX1911 (JX-2534)

708.     Loan XXXXX1897 (JX-2420)

709.     Loan XXXXX7680 (JX-2132)

710.     Loan XXXXX0151 (JX-2613)

711.     Loan XXXXX0153 (JX-2614)

712.     Loan XXXXX8616 (JX-2020)

713.     Loan XXXXX1286 (JX-2064)

714.     Loan XXXXX6557 (JX-2466)

715.     Loan XXXXX3169 (JX-2561)

716.     Loan XXXXX4432 (JX-2094)

717.     Loan XXXXX0843 (JX-2511)

718.     Loan XXXXX1054 (JX-2063)

719.     Loan XXXXX6182 (JX-2453)

720.     Loan XXXXX9094 (JX-2486)

721.     Loan XXXXX9828 (JX-2499)

[* 76]

722. Loan XXXXX4424 (JX-2093)

723. Loan XXXXX2929 (JX-2557)

724. Loan XXXXX0135 (JX-2611)

725. Loan XXXXX1744 (JX-2354)

726. Loan XXXXX1757 (JX-2355)

727. Loan XXXXX1879 (JX-2416)

728. Loan XXXXX6612 (JX-2668)

729. Loan XXXXX1317 (JX-2065)

730. Loan XXXXX3053 (JX-2559)

731. Loan XXXXX4552 (JX-2699)

732. Loan XXXXX8617 (JX-2203)

733. Loan XXXXX7732 (JX-2141)

734. Loan XXXXX0239 (JX-2625)

735. Loan XXXXX0494 (JX-2659)

736. Loan XXXXX7806 (JX-2145)

737. Loan XXXXX9556 (JX-2123)

738. Loan XXXXX9263 (JX-2693)

739. Loan XXXXX8116 (JX-2011)

740. Loan XXXXX7805 (JX-2158)

741. Loan XXXXX1288 (JX-2301)

742. Loan XXXXX1289 (JX-2302)

743. Loan XXXXX1806 (JX-2358)

744. Loan XXXXX9939 (JX-2583)

745. Loan XXXXX0402 (JX-2038)

746. Loan XXXXX6105 (JX-2450)

747. Loan XXXXX6195 (JX-2454)

748. Loan XXXXX6426 (JX-2461)

749. Loan XXXXX1494 (JX-2520)

750. Loan XXXXX8616 (JX-2202)

751. Loan XXXXX2285 (JX-2671)

752. Loan XXXXX0398 (JX-2642)

[* 77]

753.     Loan XXXXX9627 (JX-2495)

754.     Loan XXXXX3176 (JX-2562)

755.     Loan XXXXX1874 (JX-2414)

756.     Loan XXXXX1906 (JX-2424)

757.     Loan XXXXX7669 (JX-2686)

758.     Loan XXXXX9453 (JX-2687)

759.     Loan XXXXX6492 (JX-2462)

760.     Loan XXXXX0174 (JX-2616)

761.     Loan XXXXX0251 (JX-2626)

762.     Loan XXXXX0495 (JX-2660)

763.     Loan XXXXX2691 (JX-2086)

764.     Loan XXXXX5965 (JX-2434)

765.     Loan XXXXX6308 (JX-2457)

766.     Loan XXXXX6530 (JX-2464)

767.     Loan XXXXX6571 (JX-2469)

768.     Loan XXXXX3222 (JX-2564)

769.     Loan XXXXX6228 (JX-2674)

770.     Loan XXXXX9961 (JX-2588)

771.     Loan XXXXX1330 (JX-2305)

772.     Loan XXXXX0444 (JX-2043)

773.     Loan XXXXX1861 (JX-2409)

774.     Loan XXXXX1626 (JX-2335)

775.     Loan XXXXX2279 (JX-2081)

776.     Loan XXXXX6012 (JX-2441)

777.     Loan XXXXX0077 (JX-2603)

778.     Loan XXXXX0078 (JX-2604)

779.     Loan XXXXX0477 (JX-2658)

780.     Loan XXXXX1594 (JX-2524)

781.     Loan XXXXX6014 (JX-2442)

782.     Loan XXXXX3397 (JX-2567)

783.     Loan XXXXX8114 (JX-2010)

\*      \*      \*      \*

Accordingly, it is

**ORDERED AND ADJUDGED** that, as set forth above, Plaintiff U.S. Bank as Trustee has established breaches of the PSA with material adverse effect by Defendant DLJ in connection with 210 of the 783 Loans at issue, for which Plaintiff is entitled to damages in its capacity as Trustee; it is further

**ORDERED AND ADJUDGED** that Plaintiff U.S. Bank as Trustee has failed to establish breaches of the PSA by Defendant DLJ with respect the remaining 573 Loans at issue and those claims are **DISMISSED WITH PREJUDICE;** it is further

**ORDERED** that the parties submit a proposed judgment within thirty (30) days, or, should the parties be unable to agree to a form of judgment, the parties shall submit a joint status letter within thirty (30) days identifying any remaining issues (including Drs. Snow's and Torous' availability) and proposing next steps, including proposed dates for submissions and a hearing on damages (the proposed judgment or letter shall be filed on NYSCEF with a courtesy copy to sfc-part3@nycourts.gov).

Any arguments raised by the parties that are not specifically discussed in this post-trial decision have been considered and are found to be unavailing to the extent they are inconsistent with the foregoing result.

[* 79]

This constitutes the Court's Decision After Non-Jury Trial.

202412311215371MCOHENF15AFBE10F0445789AF2FC91341B5EC4

_____

**DATE: 12/31/2024**                    **JOEL M. COHEN, JSC**

**Check One:**          ☐ **Case Disposed**          ☒ **Non-Final Disposition**

**Check if Appropriate:**          ☐ **Other (Specify** _____ **)**

[* 80]